CHICAGO BOARD OPTIONS EX-
CHANGE, INC., et al., Plaintiffs,

v.

CONNECTICUT GENERAL LIFE IN-
SURANCE COMPANY, Defendant.

No. 82 C 3841.

United States District Court,
N.D. Illinois, E.D.

Nov. 17, 1982.

Robert W. Gettleman, Charles E. Levin,
D'Ancona & Pflaum, Chicago, Ill., for plain-
tiffs.

James T. Otis, Robert A. Creamer and
Patty J. Dyer, Keck, Mahin & Cate, Chica-
go, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Chicago Board Options Exchange, Inc. ("CBOE") and the Trustees of its Retirement Income Plan (the "Plan") sue Connecticut General Life Insurance Company ("Connecticut General"), which entered into a group annuity insurance contract (the "Contract") with CBOE to fund benefits under the Plan. Plaintiffs' Complaint charges Connecticut General with:

1. breach of contract (Count I);

2. deceptive conduct in violation of the Illinois Uniform Deceptive Trade Practices Act (the "Illinois Act," Ill.Rev. Stat. ch. 121½, §§ 311–17) (Count II); and

3. fiduciary improprieties in violation of the Employee Retirement Income Security Act ("ERISA," 29 U.S.C. §§ 1001–1461) (Count III).

Connecticut General has moved under Fed. R.Civ.P. ("Rule") 12(b)(6) to dismiss the entire Complaint for failure to state any cognizable claim. For the reasons stated in this memorandum opinion and order, Connecticut General's motion is granted.

### Allegations of the Complaint [1]

In 1977 CBOE and Connecticut General negotiated the Contract to fund Plan benefits effective July 1, 1978. In entering into the Contract CBOE relied on claimed misrepresentations in Connecticut General's June 1977 proposal (the "Proposal," Complaint Ex. C), including the following sentence in its "highlights" page in which it "summarize[d] the advantages" of its product:

Funds may be transferred to a new carrier if Connecticut General's performance is not entirely satisfactory.

Under the Contract the Administrator [2] was to direct Connecticut General as to the manner of crediting contributions made on behalf of the Plan's Participants (CBOE employees). Credits were to be allocated to either or both of two types of investment accounts, in such mix as the Administrator designated:

1. a "Variable Account," representing an undivided interest in a group of pooled assets (the "Separate Account") maintained by Connecticut General in connection with the Contract and other group annuity contracts (understandably, the value of the Variable Account always reflected the market value of the underlying assets); and

2. a "Guaranteed Account," providing a yield in the form of an interest rate periodically set in advance by Connecticut General (both that interest rate and the principal of the Guaranteed Account were guaranteed by Connecticut General).

Contract Parts XII and XIII defined CBOE's right to part company with Connecticut General by discontinuing further contributions and causing a transfer of the Participants' Accounts to a new funding agent (keeping the Plan qualified under the Internal Revenue Code).

All amounts allocated to Variable Accounts have always been transferable without limitation upon such discontinuation, subject only to compliance with appropriate procedures for valuation and distribution. As for Guaranteed Accounts, however, Contract § 13.03 has always permitted Connecticut General to defer full payout under these circumstances:

---

1. No findings of fact are implied, of course, by this opinion's acceptance of the Complaint's allegations for Rule 12(b)(6) purposes. To the extent other facts (such as the terms of the documentary Exhibits to the Complaint) are relevant to the legal issues, they will be referred to in this opinion's substantive discussion.

2. Contract § 1.03 required CBOE to "appoint an Administrator or Administrative Committee under the terms of the Plan to perform the duties specified in the Plan." Plan § 11.1 echoed that requirement, and § 11.2 obligated the Administrator to carry out all operating, administrative and management duties under the Plan. Plan § 1.3 designated CBOE's Treasurer to serve in that capacity. Although the Complaint itself is silent on that score, Complaint Exs. G and H are notices signed by co-plaintiff Donald James (one of the Plan's Trustees) as "Plan Administrator."

1. If the aggregate proposed transfers and withdrawals from Guaranteed Accounts on the effective date of CBOE's departure, together with previous transfers and withdrawals during the same calendar year—taking into account in each instance not only the Contract itself but all "contracts in this class of business"—exceed 10% of the total Guaranteed Contract funds for all "contracts in this class of business" as of the beginning of that calendar year, the current transfers could be deferred.

2. In any event such deferral could not block a Participant from the transfer of at least 10% of his or her Guaranteed Account in each year.

Non-transferred portions of the Guaranteed Accounts would continue to draw interest in the same manner as before.

What triggered the current dispute was an attempted amendment of the Contract by Connecticut General. Contract § 11.02 deals with "Change of Contract":

(a) Any or all of the terms of this contract may be changed from time to time by agreement in writing between the Insurance Company and the Contractholder. However, any such change shall not affect in any way the amount or terms of any Retirement Annuity purchased before the effective date of such change.

(b) The Insurance Company may, at any time, make any changes, including retroactive changes to the provisions of this contract to the extent that such changes are required in order to conform the contract to the provisions of Section 401(a) of the Internal Revenue Code as amended, ERISA or any regulation issued by any governmental agency to which the Plan or the Insurance Company is subject.

(c) The Insurance Company may change the rates in Table $A_2$ without giving advance notice of the change, provided such change is not made more frequently than once annually. Any such change shall be applicable to this contract and to all other contracts in the same class of business as this contract using the same Assumed Investment Return and shall take effect as of the date the Insurance Company makes such change. On and after the first anniversary of July 1, 1978 the Insurance Company may change from time to time any or all of the other terms of this contract. Such other change may be made by the Insurance Company by giving 90 days advance notice in writing to the Contractholder. Any such change may not affect (i) the terms or amounts of any Retirement Annuity purchased before the effective date of such change, and (ii) the amount of interest credited or accrued prior to the effective date of such change.

Connecticut General purported to amend the Contract by unilateral action in September 1981, to take effect January 1, 1982 (Connecticut General claims it complied with the 90-day notice provision of Section 11.02(c), though Complaint ¶ 12 states, "On November 13, 1981, CBOE became aware, for the first time [of the purported amendment][3]). By that amendment (the "Amendment") Connecticut General substituted "Guaranteed Account A" for the existing Guaranteed Account and created a new "Guaranteed Account B" for all contributions made after December 31, 1981. Because the Amendment also contemplated an automatic annual transfer of 10% of Guaranteed Account A to Guaranteed Account B, the deferral provisions of Contract

**3.** Plaintiffs' memorandum in opposition to Connecticut General's motion is not at all clear as to the intended thrust of that allegation—whether it claims no 90-day notice was given in fact (although Complaint Ex. D contains a "Certification" dated September 15, 1981, which *reads* like a notice of the amendment then under consideration for approval by the Illinois Department of Insurance), or whether it says a notice was actually given but is challenged by CBOE for substantive legal reasons.

Because CBOE does not really address the issue, this opinion has been written on the latter assumption. If the Complaint had (but simply failed to communicate) a different intent, plaintiffs should tender a proposed amended complaint restating its allegations plainly. Of course if insufficient notice is the only defect charged by CBOE, it must meet the other requisites of a claim as well (such as alleged damage from the inadequate notice).

§ 13.03 would be automatically triggered every year.[4]

By letter dated December 14, 1981 (Complaint Ex. G) the Administrator directed Connecticut General to transfer all CBOE employees' accounts (including both Variable and Guaranteed Accounts) to a new funding agent July 1, 1982. One week later the Administrator wrote Connecticut General challenging the Amendment and the proposed Guaranteed Account transfer as invalid (Complaint Ex. H). Connecticut General has refused to accede to that direction and challenge, adhering instead to the terms of the Amendment.

CBOE's first effort to invalidate the Amendment took the form of a complaint filed with the Illinois Department of Insurance (the "Department") December 31, 1981. Some months later the Department rejected that challenge entirely:

> After a comprehensive review of this letter, your complaint letter and the contract provisions, we are unable to discern any violation of the Illinois Insurance Code by the insurer's amendments to the contract. The contract entered into between the Chicago Board of Options Exchange and Connecticut General granted Connecticut General the right to unilaterally amend the contract as stated in Section 11.02 of the General provisions. No unfair discrimination or detrimental capability is caused by the amended contract provisions.

CBOE has sought review of the Department's decision by an administrative review complaint (still pending) in the Circuit Court of Cook County.

This opinion will deal in turn with each aspect of plaintiffs' three-pronged assault identified at the outset. None successfully states a cause of action.

4. Connecticut General claims the Amendment was intended to treat all annuity contract holders in the investment pool represented by the old Guaranteed Fund alike, sharing ratably in the lower yielding long-term securities purchased in the 1970's and in the more favorable current investment portfolio. Connecticut

## Count I

■ Apart from the notice contention referred to at n. 3, Count I claims the Amendment breached Contract § 11.02 because CBOE did not give its "agreement in writing" under Section 11.02(a). That argument is frankly nonsensical and scarcely merits discussion.

In literal terms Contract § 11.02(c) authorized the Amendment by Connecticut General's sole action, simply by notice to (and not consent of) CBOE. There are several reasons for not distorting that literal meaning, as CBOE's contention would do:

1. Each of Contract §§ 11.02(a), (b) and (c) is stated independently of the others. As even CBOE recognizes, Section 11.02(b) and the first paragraph of Section 11.02(c) do not incorporate the consent provision of Section 11.02(a). There is then no rational basis for skewing the second paragraph of Section 11.02(c) by reading it with a totally different meaning.

2. If CBOE's written consent *were* required under Section 11.02(c)'s second paragraph, its 90-day advance notice provision would be rendered wholly meaningless. By contrast, Section 11.02's literal reading gives all of its provisions a rational meaning and relationship.

3. Section 11.01 states flatly the Contract "may be modified or amended only by written agreement of the Insurance Company..."—a requirement wholly consistent with *Connecticut General's* concurrence being required under *each* subsection of Section 11.02 (subsection (a) *with* CBOE's agreement, (b) and (c) *without*). Section 11.01 does not however impose a like condition of *CBOE's* agreement to all amendments.

Because nothing in CBOE's allegations supports the notion its agreement to the

General characterizes CBOE as trying to steal a march on the other contract holders by seeking immediate withdrawal. Its Rule 12(b)(6) motion is not of course the occasion to resolve the parties' conflicting contentions as to Connecticut General's motivations.

Amendment was needed,[5] Count I cannot survive Connecticut General's motion.

### Count II

Count II alleges dual deception on Connecticut General's part, in violation of the Illinois Act:

1. In its 1977 Proposal, Connecticut General misleadingly stated without qualification that contractholders could withdraw their funds if Connecticut General's "performance is not entirely satisfactory."

2. In its 1981 description of the Amendment, Connecticut General deceptively stated the Amendment would offer employees better return rates and options "without sacrificing any of their existing rights" and "without changing [the employer's] basic plan design."

Again neither claimed misrepresentation rises to the level of a cognizable claim.

■ As for the alleged 1981 misrepresentations, Count II neither alleges nor implies any resulting injury. Indeed, the possibility of damage is refuted by CBOE's own conduct. It concededly believed the Amendment was inimical to its interests, for it both objected to Connecticut General and complained to the Department of Insurance before the January 1, 1982 effective date. It cannot be heard to say it was deluded to its detriment by the claimed 1981 misrepresentations.

■ As for the asserted 1977 misrepresentations, they run afoul of the three-year limitation period set by Section 10a(e) of the Consumer Fraud Act (Ill.Rev.Stat. ch. 121½, § 270a(e)), which controls actions under the Illinois Act. That clock starts ticking when a plaintiff first experiences (or, in some circumstances, first discovers) all the elements of injury stemming from the deceptive acts.[6] *See Airprint Systems, Inc. v. Burroughs Corp.*, No. 81 C 2119, slip op. at 1–2 (N.D.Ill. Aug. 20, 1981).

■ At least on the face of the Complaint, plaintiffs' misrepresentation injury (if any) arose when the Contract (including its Section 13.03) became effective in 1978. From that very beginning point, plaintiffs' ability to withdraw funds under the Contract was already circumscribed—and any alleged inconsistency between that limited ability and the unfettered right assertedly represented in the earlier Proposal already existed.

It may be that plaintiffs' injury became more tangible after the Administrator's unsuccessful effort to discontinue the Contract, but on the current allegations that would not affect when that injury was first incurred. Nor, on the present Complaint, can plaintiffs invoke the discovery rule to toll this statute of limitations, for Count II alleges no factual basis for doing so.

■ Indeed, even if a different assumption were made arguendo—that plaintiffs' injury occurred when the Amendment was adopted—the current misrepresentation claim would face another difficulty: There is no effective allegation of proximate causation between the 1977 deceptive statements and the current injury. Even had CBOE in fact been misled into entering the Contract, it could have averted damage by exercising its Section 13.03 withdrawal rights at any time before the Amendment restricted the effect of such exercise.

In sum, then, Count II must also fail under the current Complaint. It remains only to examine Count III.

### Count III

■ Count III says Connecticut General, by adopting the Amendment, breached its fiduciary responsibilities under ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106. That claim must be rejected because CBOE itself has acknowledged those fiduciary rules are inapplicable to Connecticut General.

---

5. It is hardly surprising that the Illinois Department of Insurance, to whom CBOE made the same argument, also read Section 11.02(c) in this sensible manner.

6. Damage is generally the last element of a misrepresentation claim to materialize. When all elements exist the claim "accrues," triggering commencement of the limitations period.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), defines the persons to whom the statute's fiduciary obligations extend:

... a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan....

Connecticut General fits none of those categories.

No serious contention can be made for application of subsections (ii) or (iii), or the "management of such *plan*" provision of subsection (i), to Connecticut General.[7] It is not an investment advisor, and the Plan management and administration are specifically vested in the Administrator. At most it might arguably be claimed Connecticut General "exercises ... authority or control respecting management or disposition of [the Plan's] assets."

But that possible aspect of "fiduciary" status with respect to the Guaranteed Accounts—the only ones at issue in this litigation—is directly negated by the parties' own contrary intentions. It takes only a brief excursion through the Plan's relevant provisions to demonstrate Count III's claim is refuted by the very documents on which it must depend:

    1. "Fiduciary" is given the same meaning in Plan § 1.17 as under ERISA

§ 3(21)(A). Thus the extent to which "fiduciary" functions are vested in Connecticut General under the terms of the Plan—and only that extent—measures the extent to which Connecticut General is a "fiduciary" under ERISA.

    2. Plan § 1.29 defines a Participant's "Guaranteed Account" as the portion of all contributions for his or her benefit invested in Connecticut General's *general portfolio,* not its "Separate Account" or any other particular assets.

    3. Plan § 1.30 defines a Participant's "Variable Account" as the portion of all contributions for his or her benefit invested in Connecticut General's "Separate Account."

    4. Plan § 1.35 in turn defines "Separate Account" as a pooled separate account of specific assets.

    5. Plan Article X defines its "Fiduciary Duties and Responsibilities." And Plan § 10.4 expressly defines and limits Connecticut General's liability as a "Fiduciary ... to that arising from its arrangement of *any assets of the Plan held by the Insurance Company in its Separate Account*" (emphasis added).[8]

In short, the parties themselves have circumscribed "the extent ... [to which Connecticut General] exercises any authority or control respecting management or disposition of [the Plan's] assets" (ERISA § 3(21)(A)). That extent reaches only to Variable Accounts, *not* Guaranteed Accounts. By the parties' own withholding of ERISA-defined "fiduciary" responsibilities from Connecticut General as to Guaranteed Accounts, they have precluded CBOE's assertion of a claim based on a breach of such non-existent ERISA duties.[9]

---

**7.** CBOE's counsel, in drafting the Complaint, simply parroted the several subcategories of the statutory "fiduciary" test. That cannot have been done in good conscience or mindful of counsel's responsibilities under Rule 11, for no fair reading of the Plan or Contract permits characterizing Connecticut General as (for example) "render[ing] investment advice" or having "any discretionary authority or discretionary responsibility *in the administration of such plan*...."

**8.** Contract § 1.17 and the related subsequent Contract sections track and corroborate that limited fiduciary role allocated to Connecticut General by the parties themselves.

**9.** This opinion has not discussed the parties' competing arguments based on ERISA's statutory language, or case law construing that language, considered in a vacuum. Clearly the parties have the right to repose as little or as much authority as they desire in a "person"— here Connecticut General. That is something

*Conclusion*

Plaintiffs have struck out on all three counts. Their Complaint is dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

totally different from permitting parties to waive (or override) congressional intention, an issue that need not be dealt with here. It may be added however that if ERISA (looked at alone) posed any ambiguities as to Connecticut General's status, the intent of the parties would provide a solid and definitive basis for resolving those ambiguities as well.