713 F.2d 254
 4 Employee Benefits Cas. 1927
 CHICAGO BOARD OPTIONS EXCHANGE, INC., Contractholder, and
Donald R. James, Charles J. Henry, and William J. Young,
Trustees of and Participants in the Chicago Board Options
Exchange, Inc. Retirement Income Plan, Plaintiffs-Appellants,
v.
CONNECTICUT GENERAL LIFE INSURANCE COMPANY, A Connecticut
Corporation, Defendant-Appellee.
 No. 82-2967.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 13, 1983.
Decided July 11, 1983.
 
 Robert W. Gettleman, Lawrence J. Moss, D'Ancona & Pflaum, Chicago, Ill., for plaintiffs-appellants.
 James T. Otis, Keck, Mahin & Cate, Chicago, Ill., for defendant-appellee.
 Before CUMMINGS, Chief Judge, PELL, Circuit Judge, and BROWN, Senior Circuit Judge.*
 PELL, Circuit Judge.
 
 
 1
 Plaintiffs appeal the dismissal of their three count complaint against defendant Connecticut General Life Insurance Company (Connecticut General). The dispute has its genesis in Connecticut General's unilateral amendment of an annuity contract it entered into with Chicago Board Options Exchange, Inc. (CBOE). The contract was designed to fund retirement benefits provided by CBOE under its Retirement Income Plan. CBOE objected to the amendment and unsuccessfully tried to withdraw from the contract. After Plaintiffs' complaint to the Illinois Department of Insurance proved fruitless they filed this suit. Plaintiffs charged Connecticut General with breach of contract, breach of its fiduciary duty under the Employment Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (ERISA), and violation of the Illinois Uniform Deceptive Trade Practices Act. Ill.Rev.Stat. ch. 121 1/2, § 311 et seq. The district court found that none of the counts stated a cause of action and granted defendant's motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co., 553 F.Supp. 125 (N.D.Ill.1982).
 
 
 2
 I The Annuity Contract.
 
 
 3
 Effective July 1, 1978, CBOE converted its existing Retirement Income Plan (Plan) from a defined benefit pension plan to a defined contribution money purchase pension type of thrift plan. In order to fund the Plan efficiently CBOE entered into an annuity contract with Connecticut General. Under the contract contributions on behalf of each employee were paid into that employee's account, which in turn was divided into two different investment accounts: a "Variable Account" and a "Guaranteed Account."
 
 
 4
 The two accounts differed in the manner in which they were funded by Connecticut General and in the manner in which interest rates were determined. Contributions to a Variable Account were invested in a pool of securities and, as the name implies, the rate of return varied according to the performance of the securities. Contributions to a Guaranteed Account, on the other hand, were invested in Connecticut General's general portfolio. Connecticut General guaranteed the amount of interest to be paid in advance, although the rate of return could be changed by Connecticut General "from time to time." Connecticut General also guaranteed all contributions and interest already credited to the account.
 
 
 5
 The Variable and Guaranteed Accounts also differed in the ease with which a participant could withdraw money from the account. Contributions to a Variable Account could be withdrawn at any time, but contributions to a Guaranteed Account could only be withdrawn under certain circumstances. If the amount sought to be withdrawn, together with (1) other amounts to be withdrawn on that date from the Guaranteed Account funds of contracts in the same class of business, and (2) amounts already transferred or withdrawn from Guaranteed Account funds of contracts in the same class of business during that calendar year, exceeded 10% of the total Guaranteed Account funds for contracts in the same class of business, then Connecticut General could limit the withdrawal to 10% of the Guaranteed Account balance and defer withdrawal of the remainder to later years.
 
 
 6
 The contract allowed a contractholder, such as CBOE, to discontinue contributions and transfer accumulated assets to a new funding agent. Discontinuance did not become effective until 90 days from the first day of the month after Connecticut General received notice of the contractholder's desire to terminate. Transfer of funds to a new funding agent was subject to the same 10% restriction that applied to withdrawals from a Guaranteed Account.
 
 
 7
 II Amendment of the Guaranteed Account.
 
 
 8
 In late 1981 Connecticut General informed contractholders that it was amending the annuity contract to serve better beneficiaries "without sacrificing any of their existing rights." The effect of the amendment was to redesignate each existing Guaranteed Account as "Guaranteed Account A," while creating a new "Guaranteed Account B." The new "B" account was supposed to provide a higher rate of return than the old Guaranteed Account. Each year 10% of the funds in Guaranteed Account A would be transferred to Guaranteed Account B. The obvious result was that each year, for the next 10 years, the 10% transfer quota would be filled by this inter-account transfer, thus triggering Connecticut General's right to defer any other withdrawals from the Guaranteed Accounts.
 
 
 9
 CBOE thought that the purpose of the amendment was to enhance Connecticut General's profits by freezing funds in the Guaranteed Accounts, which had been paying below market rates. CBOE sought to discontinue the contract, but was unable to withdraw its funds before the amendment took effect. After the Illinois Department of Insurance ruled that the amendment did not violate the Illinois Insurance Code, plaintiffs filed this suit.
 
 
 10
 III Breach of Contract.
 
 
 11
 Proceeding under diversity jurisdiction, CBOE alleged that Connecticut General's unilateral amendment was not permitted under the contract. The district court ruled that Connecticut General had the right to effect this type of amendment unilaterally. In reaching this conclusion the court relied upon the following provisions in the contract:
 
 
 12
 11.02 Change of Contract(a) Any or all of the terms of this contract may be changed from time to time by agreement in writing between the Insurance Company and the Contractholder. However, any such change shall not affect in any way the amount or terms of any Retirement Annuity purchased before the effective date of such change.
 
 
 13
 (b) The Insurance Company may, at any time, make any changes, including retroactive changes to the provisions of this contract to the extent that such changes are required in order to conform the contract to the provisions of Section 401(a) of the Internal Revenue Code as amended, ERISA or any regulation issued by any Governmental agency to which the Plan or the Insurance Company is subject.
 
 
 14
 (c) The Insurance Company may change the rates in Table A sub2 without giving advance notice of the change, providing such change is not made more frequently than once annually....
 
 
 15
 On or after the first anniversary of July 1, 1978 the Insurance Company may change from time to time any or all of the other terms of this contract. Such other change may be made by the Insurance Company giving 90 days advance notice in writing to the Contractholder. Any such change may not affect (i) the terms or amount of any Retirement Annuity purchased before the effective date of such change, and (ii) the amount of interest credited or accrued prior to the effective date of such change.
 
 
 16
 11.03 Consent not Required. Consent of any Participant, Beneficiary, Survivor Annuitant, or Contingent Annuitant shall not be required to effect any change in the contract.
 
 
 17
 The district court read section 11.02(c) of the contract as authorizing a unilateral amendment by Connecticut General without the consent of CBOE. The court rejected CBOE's contention that the contract could be construed as either requiring CBOE's consent or allowing CBOE to withdraw from the contract when Connecticut General elected to amend. The court reasoned that CBOE's construction rendered the 90-day notice provision "wholly meaningless." 553 F.Supp. at 128. Plaintiffs now contend that the court erred in not adopting their construction of the contract or, alternatively, in not finding the contract ambiguous and considering extrinsic evidence to aid in interpretation.
 
 
 18
 We begin our analysis with the observation that, "Insurance policies should be construed as a whole, giving effect to every part, as far as it is possible." Hartford Accident & Indemnity Company v. Case Foundation Company, 10 Ill.App.3d 115, 121, 294 N.E.2d 7, 12 (1973). In this case the relevant portions of the contract are found in section 11.02(c) and 11.03, which provide that (1) "the Insurance Company may change from time to time any or all of the other terms of the contract," (2) unilateral amendment may be effected by Connecticut General "giving 90 days advance notice in writing to the Contractholder," and (3) such amendments do not require the consent of the persons listed in 11.03.
 
 
 19
 The district court read these provisions as clearly granting Connecticut General the right to amend unilaterally. While we do not agree with plaintiffs' contention that the contract, on its face, requires CBOE's consent or, at the least, allows CBOE to withdraw during the 90-day notice period, we also do not find the clarity that the district court relied upon in dismissing this count. The question, at this stage of the litigation, is not whether the contract allows Connecticut General to amend unilaterally, but rather whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Mescall v. Burrus, 603 F.2d 1266, 1269 (7th Cir.1979) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957)). If the contract provisions are so clear that there can be no question as to their meaning, then the district court was correct in construing the contract without the aid of any evidence plaintiffs may have to offer. If, on the other hand, the contract is ambiguous, then plaintiffs should be allowed to introduce extrinsic evidence in support of their construction. In construing an ambiguous contract the court must consider any evidence that sheds light upon the intentions of the parties, including the situation of the parties, the purpose of the contract, and the circumstances surrounding the formation of the contract. Zelinsky v. Associated Aviation Underwriters, 478 F.2d 832, 834 (7th Cir.1973); Ortman v. Stanray Corp., 437 F.2d 231 (7th Cir.1971); Garmen v. New York Life Insurance Co., 501 F.Supp. 51 (N.D.Ill.1980); Olipera v. Zambelli, 1 Ill.App.3d 607, 274 N.E.2d 877 (1971).
 
 
 20
 We will not bend the language of a contract to create an ambiguity when none exists, Chicago Terminal Clearance, Inc. v. St. Paul Marine Insurance Co., 407 F.2d 552, 553 (7th Cir.1969), but neither will we follow a literal interpretation when such would lead to an unreasonable or absurd result. Garmen v. New York Life Insurance Co., 501 F.Supp. 51, 53 (N.D.Ill.1980). We believe that an honest ambiguity exists concerning CBOE's rights when confronted with a unilateral amendment. The district court rejected CBOE's proposed interpretations because they failed to account for the 90-day notice provision. We fail to see how Connecticut General's interpretation, which focuses upon only one sentence in section 11.02(c) and grants it the unfettered right to amend, imparts any more meaning to the notice provision. Under Connecticut General's reading, CBOE is powerless to do anything about a proposed amendment during the 90 days. Such a one-sided reading, while not totally unsupported, must be considered as suspect. See Ortman v. Stanray Corp., 437 F.2d 231 (7th Cir.1971) (contract interpretation that gave one party unilateral right to terminate payments viewed as suspect). Under one of CBOE's proposed constructions the 90 days would allow a contractholder to withdraw and find a new funding agent. This interpretation is further supported by the fact that CBOE could have withdrawn had notice of the amendment been given on the first of the month as then the 90-day termination notice and 90-day amendment notice would dovetail. It strikes us that a construction that varies CBOE's rights depending upon the day of the month was not what the parties had in mind, and accordingly that there is a real question as to what purpose the 90-day notice was to serve. In short, we find that the district court erred in not allowing CBOE to introduce evidence in support of its construction of the contract.
 
 
 21
 CBOE has also argued that the contract can be read as requiring a contractholder's consent to an amendment. While we do not find this argument very persuasive, especially in light of the language of 11.02(c) as contrasted with 11.02(a), we do not believe that the contract is so clear that CBOE should be precluded from introducing evidence in support of this construction. Section 11.03, which lists those persons who need not consent to an amendment, pointedly does not include contractholders in the group. According to the maxim "expressio unius est exclusio alterius," such an omission implies that the parties intended to require a contractholder's consent. E.g. Conway v. County Casualty Insurance Co., 97 Ill.App.3d 768, 774, 53 Ill.Dec. 175, 180, 423 N.E.2d 559, 564 (1981), modified on appeal, 92 Ill.2d 388, 65 Ill.Dec. 934, 442 N.E.2d 245 (1982). The ambiguity created by the apparent grant to Connecticut General of an absolute right to amend unilaterally while, at the same time, the omission of contractholders from the list of persons who need not consent to an amendment will be best resolved by allowing the parties to introduce whatever evidence is available concerning their intentions.
 
 
 22
 IV ERISA Fiduciary.
 
 
 23
 In count three of plaintiffs' complaint they allege that Connecticut General was a fiduciary under ERISA, and that the amendment of the annuity contract constituted a breach of the insurance company's fiduciary duties. Connecticut General denied that it was a fiduciary, that it had breached any fiduciary duty, and that it was even subject to ERISA. The district court, relying upon a contractual limitation of liability, agreed that Connecticut General was not a fiduciary and dismissed this count of the complaint on that basis. We need only consider whether Connecticut General is subject to ERISA's fiduciary obligations; whether the amendment constituted a breach of these obligations must await trial.
 
 
 24
 The definition of fiduciary under ERISA is set forth at 29 U.S.C. § 1002(21)(A), which, in pertinent part, provides that:
 
 
 25
 [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. (emphasis added).
 
 
 26
 The parties agree that the annuity contract is a plan asset, but differ as to whether Connecticut General's amendment of the contract is sufficient to charge it with fiduciary obligations. The district court rejected plaintiffs' claims that Connecticut General fit within either (ii) or (iii) of the statutory definition, but recognized that "it might arguably be claimed Connecticut General 'exercises ... authority or control respecting management or disposition of [the Plan] assets,' " but went on to find that section 10.4 of CBOE's Plan precluded fiduciary status for Connecticut General. Section 10.4 provides that, "the Insurance Company's liability as a Fiduciary is limited to that arising from its management of any assets of the Plan held in its separate account." The only Plan assets held in Connecticut General's Separate Account were contributions to the Variable Accounts, which are not an issue here. The district court reasoned, therefore, that Connecticut General was not a fiduciary with respect to any action taken regarding the Guaranteed Accounts.
 
 
 27
 The district court thought that the effect of Plan section 10.4 was to limit the discretionary authority over the Guaranteed Accounts vested in Connecticut General, and thus remove any fiduciary status with respect to these accounts. We do not agree. By its own terms section 10.4 limits only Connecticut General's liability, not its discretionary authority. The difference is important because, although the parties may decide how much authority to vest in any person, they may not decide how much liability attaches to the exercise of that authority. ERISA explicitly provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a). As the legislative history of this provision makes clear, "exculpatory provisions which relieve a fiduciary from liability for breach of the fiduciary responsibility are to be void and of no effect." H.R.Rep. 1280, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Ad.News 4639, 5038, 5101. Connecticut General may not evade fiduciary status through such an exculpatory clause if, in fact, fiduciary status accompanies the company's ability to amend the contract.
 
 
 28
 The district court recognized that Connecticut General's ability to amend the contract, which is a Plan asset, might give it control over disposition of Plan assets. 553 F.Supp. at 130. If this is the case, then Connecticut General is a fiduciary under ERISA. 29 U.S.C. § 1002(21)(A). It is important to remember that if Connecticut General is a fiduciary because of the power to amend, this status only governs actions taken in regard to amending the contract and does not impose fiduciary obligations upon Connecticut General when taking other actions. Id. (person is a fiduciary only "to the extent" that he has authority over Plan assets).
 
 
 29
 This appears to be a question of first impression, although several cases have stated in dicta that the power to alter such a policy imposes fiduciary obligations upon the insurance company. Eversole v. Metropolitan Life Insurance Co., 500 F.Supp. 1162, 1165 (C.D.Cal.1980) (held that insurance company with power to deny claims was a fiduciary, but also stated that company "may also be a fiduciary by virtue of its management or control over the primary asset of this plan, the policy itself."); cf. Robbins v. First American Bank of Virginia, 514 F.Supp. 1183, 1191 (N.D.Ill.1981) (bank was not a fiduciary because it could not amend loan participation agreement, which was a plan asset, without participant's consent). Despite the novelty of this issue, and the dearth of any definitive guidance, we are confident that Connecticut General's power to amend the contract carried with it the status of ERISA fiduciary.
 
 
 30
 It is clear that Congress intended the definition of fiduciary under ERISA to be broad, Little & Thrailkill, Fiduciaries Under ERISA: A Narrow Path to Tread, 30 Vand.L.Rev. 1, 4 (1977). For our purposes the relevant question is whether the power to amend the contract constitutes the requisite "control respecting ... disposition of [plan] assets." 29 U.S.C. § 1002(21)(A). Had CBOE simply given Plan assets to Connecticut General and said, "Invest this as you see fit and we will use the proceeds to pay retirement benefits," Connecticut General would clearly have sufficient control over the disposition of Plan assets and be a fiduciary under ERISA. Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance Co., 698 F.2d 320 (7th Cir.1983). Because Connecticut General guaranteed the rate of return in advance for the Guaranteed Accounts, that is not the case here. Nevertheless, the policy itself is a Plan asset, and Connecticut General's ability to amend it, and thereby alter its value, is not qualitatively different from the ability to choose investments. By locking CBOE into the Guaranteed Accounts for the next 10 years Connecticut General has effectively determined what type of investment the Plan must make. In exercising this control over an asset of the Plan, Connecticut General must act in accordance with its fiduciary obligations. Whether the amendment was a breach of the fiduciary obligations is not a question that can be resolved at this stage of the litigation.
 
 
 31
 Connecticut General's final argument is that as an insurance company subject to state regulation it is not subject to ERISA. ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). ERISA also provides, however, that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A). Connecticut General argues that Congress' decision not to exempt insurance companies from state regulation should somehow be read as relieving insurance companies from the burdens imposed by ERISA. Nothing in section 1144(b)(2)(A) supports this reading. That ERISA does not relieve insurance companies of the onus of state regulation does not mean that Congress intended ERISA not to apply to insurance companies. Had that been Congress' intent we are sure that ERISA would have directly stated that it was preempted by state insurance laws. Congress clearly intended that insurance companies be subject to dual regulation, at least as long as federal and state regulations do not conflict. Eversole v. Metropolitan Life Insurance Co., 500 F.Supp. at 1170. As state law does not forbid that Connecticut General act as a fiduciary in making amendments to the contract, there is no reason not to subject the company to the fiduciary obligations set forth in ERISA. Accordingly, this count is remanded to the district court for determination of the propriety of the amendment.
 
 
 32
 V Misrepresentation.
 
 
 33
 In count II of their complaint, plaintiffs alleged that they were induced to enter into the contract by misrepresentations contained in Connecticut General's 1977 marketing proposal for the annuity contract. In this marketing proposal Connecticut General made statements regarding the ease with which funds could be transferred to a new funding agent if Connecticut General's performance proved unsatisfactory. Plaintiffs alleged that these representations were false, as plaintiffs' inability to withdraw funds after the amendment demonstrated. Plaintiffs claimed that these misrepresentations violated the Illinois Uniform Deceptive Trade Practices Act, Ill.Rev.Stat. ch. 121 1/2, § 312(5), entitling them to recover actual damages under the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121 1/2, § 261 et seq.[1]
 
 
 34
 The district court found that this claim ran afoul of the three year statute of limitations imposed by the Consumer Fraud Act, Ill.Rev.Stat. ch. 121 1/2, § 270a(e). The court recognized that, "That clock starts ticking when a plaintiff first experiences ... all the elements of injury stemming from the deceptive acts." 553 F.Supp. at 129. The court found that any injury occurred when the contract, containing the 10% limit on withdrawals, became effective in 1978, more than three years before the complaint was filed. The court also found, alternatively, that even if no injury occurred until the amendment cut off all withdrawals for the next ten years, the amendment could not be the proximate cause of plaintiffs' injury as they could have exercised their right to transfer to a new agent.
 
 
 35
 This last basis for dismissal can be dealt with quickly. Plaintiffs alleged that they attempted to withdraw their funds but were unable to do so because the discontinuance notice period was longer than the amendment notice period. Assuming, then, that the statute of limitations had not yet run, it is clear that the amendment was the cause of plaintiffs' injury. The only question that remains is whether, as a matter of law, plaintiffs should have realized that Connecticut General's statements were false when the contract took effect.
 
 
 36
 At this stage of the litigation we do not know what the practical effect of the 10% withdrawal limit was. We do not know whether Connecticut General consistently exercised its right to defer withdrawals when the limit was met. We do know that plaintiffs alleged that their account was frozen by the amendment, not by the 10% withdrawal limit. There is a qualitative difference between the 10% limit, which only required that CBOE compete with other contractholders to withdraw its money, and the amendment, which usurped the withdrawal limit for the next decade. It is not unreasonable to suggest that there would be nothing inconsistent between Connecticut General's representations concerning free transferability and the 10% limit, at least as viewed by a contractholder such as CBOE that constituted less than 1% of the pool. In this situation we believe that it was error to rule that, as a matter of law, plaintiffs' injury was caused by the 10% limit rather than by the amendment. Should the evidence at trial reveal that the 10% limit was a real obstacle to withdrawal, and that plaintiffs should have been aware of this, it will be time enough to dismiss this count of the complaint.
 
 CONCLUSION
 
 37
 For the reasons stated herein, we REVERSE the dismissal of plaintiffs' complaint and remand the case for further proceedings consistent with this opinion. Circuit Rule 18 shall be applicable.
 
 
 
 *
 Bailey Brown, Senior Circuit Judge for the Sixth Circuit, is sitting by designation
 
 
 [1]
 Plaintiffs also claimed that Connecticut General's statements concerning the beneficial aspects of the amendment were actionable misrepresentations. The district court found that plaintiffs could not have relied in any way upon these statements as CBOE immediately objected to the amendment. Plaintiffs have not advanced any reason for finding this logical result in error, and we accordingly affirm on this point