William E. BROCK, Secretary of U.S. Dept. of Labor

v.

Paul D. SELF, et al.

Civ. A. No. 84–0194.

United States District Court, W.D. Louisiana, Lake Charles Division.

April 17, 1986.

William P. Tedesco, U.S. Dept. of Labor, Washington, D.C., D.H. Perkins, Jr., Asst. U.S. Atty., Shreveport, La., for plaintiff.

Robert B. Mitchell, Ellis B. Murov and Graham Stafford, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., for Paul D. Self, David Self, Amanda Self, Ollie Mae Sharp, Charles C. Peveto, Sel-Mart of Sulphur, La., Inc., & Danor Wholesale, Inc.

Alvin B. King, Lake Charles, La., for Louise Shelton.

G. Duffield Smith, Jr., and Susan E. Fenner, Gardere & Wynne, Dallas, Tex., Fred H. Sievert, Stockwell, Sievert, Viccellio, Clements and Shaddock, Lake Charles, La., for Hancel McCord, Hancel McCord Co., S. Courtney McCord and Adell Houston.

## OPINION

VERON, District Judge.

### INTRODUCTION

This matter is before the Court for a determination of liability on those causes of action set forth in the Third-Party complaint of Paul Self, Amanda Self, David Self, Charles Peveto, Ollie Mae Sharp, Louise Shelton, Sel-Mart of Sulphur, La., Inc., and Danor Wholesale, Inc., against Third-Party Defendants, Hancel McCord Company, Inc., Hancel McCord, Adell Houston, and A. Courtney McCord.[1] The principal action filed by William E. Brock, Secretary of the United States Department of Labor against the aforementioned Third-Party Plaintiffs having been settled by means of a Consent Order, a trial on the merits of the Third-Party complaint alone was heard by this Court, sitting without a jury, on October 22 and 23, 1985 in accordance with the following "Trial Stipulations Between Third-Party Plaintiffs and Third-

---

**1.** The Court directed a verdict in favor of Third-Party Defendant A. Courtney McCord at the close of Third-Party Plaintiffs' case-in-chief.

Party Defendants" agreed to and filed by the parties:

1. Plaintiff, William E. Brock, in his capacity as Secretary of the United States Department of Labor, brought the principle [sic] action against the Defendants Third-Party Plaintiffs, under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

2. The principle [sic] case concerned allegations by the United States Department of Labor ("DOL") that the Defendants/Third-Party Plaintiffs breached fiduciary obligations that they owed to the Gibson Products Company of Lake Charles and Orange Profit Sharing Plan (the "Plan"), thereby violating multiple provisions of ERISA.

3. The DOL Complaint contained three basic charges of wrongdoing:

a. First, Defendants/Third-Party Plaintiffs were charged with a failure to require payment of fair rent on leases executed in 1977 between the Plan and the Defendant Employers (Sel-Mart of Sulphur, Louisiana, Inc., and Danor Wholesale, Inc.) for the use of Orange, Texas and Sulphur, Louisiana store buildings that were owned by the Plan[ ]. The DOL claimed that the trustee Defendants/Third-Party Plaintiffs permitted the Plan to engage in a prohibited transaction by allowing it to lease the Orange and Sulphur store buildings to parties in interest, i.e., the Defendant employers. [The Sulphur store was leased to Sel-Mart of Sulphur, Louisiana, Inc. and the Orange store was leased to Danor Wholesale, Inc.] 29 U.S.C. § 1106. On the same basis, DOL alleged that Defendant/Third-Party Plaintiff Self was guilty of managing the Plan properties in his own self interest. These two claims were both alleged to represent breaches of fid[u]ciary duty as defined by ERISA. *See*, 29 U.S.C. § 1104.

b. Second, the Complaint alleged that the Defendants/Third-Party Plaintiffs Trustees had failed to revalue the market value of the Orange and Sulphur store buildings each year as required by the Plan documents.

c. Finally, it was claimed that the trustees failed to adequately diversify the Plan's assets; investing the vast bulk of the Plan's money assets in the Orange and Sulphur store buildings instead.

4. The factual disputes central to the principle [sic] claim were:

a. Whether the Defendant/Third-Party Plaintiff employers had leased the Orange and Sulphur properties for adequate consideration as that term is defined by ERISA § 3(18), 29 U.S.C. § 1002(18); and

b. What the fair market value of the Orange and Sulphur properties was for the period 1978 to 1985 (Defendants/Third-Party Plaintiffs conceded their error in not annually revaluing the buildings, however, they had not conceded the actual valuations that should have been placed in those buildings for purposes of calculating whether additional monies were owed to the Plan.)

5. The potential losses that could have arisen from a finding of Defendant/Third-Party Plaintiff liability were substantial. Unde[te]rmined payments would have been due to the terminated Plan participants as a result of the reevaluation of the Orange and Sulphur property values for the [period of] 1978 to 1985. The fair lease issue raised the largest spectre of potential liability. Liability in the event of an adverse judgment on the DOL's claim could have exceeded $700,000. Additionally, an adverse judgment entered on the DOL claim would have triggered an obligation on the part of the trustees to report their participation in a prohibited transaction to the Internal Revenue Service. Such a report would have caused the levy of a penalty that also would have approximated $700,-000. The total potential liability on the lease question was $1.4 million.

6. The DOL's claims have been compromised by the Plaintiff, and Defendant/Third-Party Plaintiff. The terms of the compromise are memorialized in a Notice of Agreement to Enter Consent Decree, which has been filed with this court. . . .

7. The Third-Party Defendants agree that the Third-Party Plaintiff's compromise with the DOL was reasonable. The Third-Party Plaintiffs also agree to waive any defense that they might have, to the claim of Third-Party Plaintiffs, based upon a theory that Third-Party Plaintiffs had, in fact, no liability to the DOL. For purposes of the action between the Third-Party Plaintiffs and Third-Party Defendants only, Third-Party Defendants concede that Third-Party Plaintiffs were liable to the DOL for the amounts and in the manner agreed upon in the Notice of Agreement to Enter Consent Decree.

8. Third-Party Plaintiffs and Third-Party Defendants also agree as to the elements of damage upon which the Court has been asked to rule in the action between them; the issue of quantum being reserved for subsequent disposition. Those damages claims are:

a. An obligation for reimbursement by Third-Party Defendants to Third-Party Plaintiffs of all amounts agreed to be paid in settlement of the lease transaction claims, as stated in paragraph No. 1 of the Notice of Agreement to Enter Consent Decree;

b. Reimbursement by Third-Party Defendants to Third-Party Plaintiffs of any amounts Third-Party [Plaintiffs] are compelled to pay out-of-pocket pursuant to the terms of paragraph[ ] nos. 3, 4, 5 and/or 6 of the ... Notice of Agreement to Enter Consent Decree [pertaining to an adjustment in the 1978–1984 fair market sales values and to a recalculation of all past and present Plan participants' accounts to reflect increases in the valuations of the Plan's Orange, Texas and Sulphur, Louisiana properties]; and

c. The propriety of Third-Party Defendants reimbursing Third-Party Plaintiffs for the attorneys' fees and other costs of defense incurred by Third-Party Plaintiffs in contesting the DOL claims.

Accepting, and being bound by these stipulations, the Court now rules as follows:

## FINDINGS OF FACT

1. Third-Party Plaintiffs, Sel-Mart of Sulphur, Inc. ("Sel-Mart") and Danor Wholesale Corp. ("Danor") are both part of the Sel-Mart, Inc. chain of retail discount stores. Sel-Mart, Inc. and its various subsidiaries operate several such stores in the Lake Charles, Louisiana area. Sel-Mart operates a store located in Sulphur, Louisiana. Danor operated a store in Orange, Texas, until approximately March 1, 1985.

2. Third-Party Plaintiffs, Paul Self, Amanda Self, David Self, Charles Peveto, Ollie Mae Sharp and Louise Shelton are former and present Trustees of the Gibson Products Company of Lake Charles and Orange Profit Sharing Plan (the "Plan"). Paul Self was and is the principal owner and chief executive of Sel-Mart, Inc. and its subsidiaries, Sel-Mart and Danor. Paul Self was and is, as a practical matter, the primary decision maker among the Trustees.

3. The Orange, Texas, building used as a retail store by Danor is owned by the Plan. The Plan also owns a large part of the store operated by Sel-Mart in Sulphur, Louisiana. In each case, the Plan leases or leased the stores back to the operating company.

4. Sel-Mart and Danor were part of the Gibson's Products discount retail store chain and were known as "Gibson's" stores until 1982, when the stores withdrew from their Gibson's franchises and were renamed "Sel-Mart" and "Danor Wholesale."

5. Third-Party Defendant Hancel McCord Company, Inc. ("HMC") is a pension plan service company located in Dallas, Texas. Third-Party Defendant Hancel McCord is the chief executive officer and principal stockholder of HMC. McCord has been in the insurance, pension, profit-sharing plan and employee benefits business since prior to 1941. Third-Party Defendant Adell Houston has worked for HMC and its predecessors since 1957. She manages the pension and profit-sharing plan servicing operations of HMC, and is also an HMC stockholder.

6. McCord maintained a booth at the Gibson's Discount Stores Trade Shows in Dallas, Texas for several years. He met with Gibson's franchisees, explained em-

ployee profit-sharing plans for their individual Gibson's stores, and encouraged the franchisees to have him establish and service such plans.

7. McCord made various representations to Paul Self about the services which McCord would provide if Self agreed to the establishment of employee profit-sharing plans for the Gibson's stores in Orange, Texas and Sulphur, Louisiana (subsequently renamed Danor Wholesale and Sel-Mart, respectively) in 1965. McCord represented that he would provide the Trust and the Plan documents required to initiate the Plan, that he would file reports with the Internal Revenue Service and the Department of Labor as required, that he would supply the Plan's trustees with whatever "Plan Amendments" were needed in order to keep the Plan in conformity with law, and that he and his company would be available to answer any and all questions which the trustee's may have regarding the management and the administration of the Plan.

8. After discussing the establishment of a profit-sharing pension plan with Paul Self, Hancel McCord personally came to Lake Charles, Louisiana and made a slide presentation to the employees of the Gibson Stores in 1965. The slide show included an "OK List" on "How May This Money [i.e., pension plan trust assets] Be Invested," and specifically noted that some plan's had "leased back to the company at arms-length transactions" some investment properties, including real estate, which resulted in generating substantial income for the Plan Trust.

9. Following McCord's presentation, it was agreed that a profit-sharing pension plan would be established which would be serviced by HMC. All of the documents and materials necessary to establish the Plan were provided by HMC, and the Plan became effective in 1965. Self did not seek any other assistance in establishing the Plan and, in Self's own words, he henceforth "relied on Hancel McCord as the sole authority we had regarding the profit-sharing plan."

10. In return for its services, HMC received a fee plus a commission on the life insurance policies sold to Plan participants, and also received fees for performing specific services, such as for completing particular forms to be filed with the Department of Labor and Internal Revenue Service. The Court makes no findings as to the specific amounts of compensation actually received by HMC for the totality of its services, as no such evidence was presented.

11. On March 26, 1966, Paul Self wrote to Hancel McCord: "I need some advice about how to lease & build the building by our profit sharing plan. Please tell me how to go about it...." Third-Party Plaintiffs' Exhibit #41. This concerned the Plan's purchase of land in Sulphur, Louisiana and construction of a building, which would become the Sel-Mart retail store and would be leased back to Self by the Plan. Adell Houston responded on behalf of McCord and provided specific advice about how the business lease should be framed. Houston's letter (Third-Party Plaintiffs' Exhibit #42) included specific legal definitions and advice as to what extent the rents from a business lease may be taxable. While Houston's letter included a caveat, to-wit, "Before a trust enters into a lease it should have legal counsel," it also provided that Self could discuss his plans with McCord at the time of the Dallas Toy Market in May. Self was subsequently advised, orally by McCord, that such a lease-back was proper so long as it was an arms-length transaction and the property should not be leased for more than five years or else there would be adverse income tax consequences. Self followed Houston's and McCord's advice and had the Plan construct the Sulphur store and lease it back to Self's company, which subsequently became known as Sel-Mart of Sulphur, Louisiana.

12. Paul Self subsequently caused the Plan to purchase and subdivide some undeveloped land at Toledo Bend Lake in Louisiana, but when Hancel McCord became aware of the purchase, he specifically advised Self that the Plan could not legally invest trust monies in property which was

not income-producing. Acting in reliance upon McCord's advice, Self caused the Plan to sell the said land.

13. Further acting in reliance upon the advice provided by Adell Houston and Hancel McCord, Self and the Plan trustees caused the Plan to construct a store building in Orange, Texas and enter into a lease agreement with Self's company, which subsequently became known as Danor Wholesale.

14. At a Gibson's Products trade show in Dallas in 1976, Mr. Gibson, the founder of Gibson's retail chain, called a meeting regarding profit-sharing plans and he, along with a Gibson's Products attorney, recommended to all Gibson's franchisees that they "dissolve" their retirement plans due to the complex legal problems created by the enactment of ERISA. Following Gibson's advice, Paul Self went to Hancel McCord and told McCord that he wanted to dissolve the Plan. McCord, however, strongly urged Self to leave the Plan in effect and assured Self that the Hancel McCord Company would do everything to make certain that the Plan was maintained in conformity with ERISA's requirements. Paul Self agreed to leave the Plan in effect based upon the various representations and assurances which McCord had made.

15. Prior to that Gibson's meeting in 1976 and subsequent to the enactment of ERISA in 1974, Hancel McCord had written to Paul Self concerning the new Act's requirements:

"We are making ready our office, or 'tooling up' our organization, to handle all matters to meet the necessary requirements.

"We feel your Trust already meets many of the requirements, which will require only a minimum of amendments or substitutions. We have retained a large attorney firm, experienced in this field, to assist us in securing information on the Act.

"We have broadened our services to assist in all types of plans which are required to meet government requirements ...." Third-Party Plaintiffs' Exhibit # 50.

After Self's meeting with McCord, McCord continued to assure Self everything would be taken care of, and wrote to Self:

"We are now working with attorneys in restating the Full Trust instrument to comply with the new law.... There are many other facets necessary to change.... I'll assure you your business will be handled accurately and qualified to meet the standards of government requirements." Third-Party Plaintiffs' Exhibit # 55.

16. As represented by McCord, the Hancel McCord Company, via Adell Houston, forwarded various form "Amendment[s] to the Trust Agreement Governing Gibson Products Companies of Lake Charles and Orange Profit Sharing Plan," as well as form "[e]xcerpts of the minutes of ... meeting[s] of the Board of Directors of Gibson Products Co. of Lake Charles, Inc., Gibson Products Co. of Orange, Texas, Inc. and Gibson Products Co., Inc. of Sulphur, La. agreeing to adopt the ... Amendment[s] to the Trust." See, e.g., Third-Party Plaintiffs' Exhibits # 38, 43, 52, 53, 57, 68, 69, 71. These amendments and Board of Directors meeting minutes were forwarded for "pro forma ratification" by Paul Self and the Plan trustees, to be "executed and returned" to HMC. See Third-Party Plaintiffs' Exhibits # 53, 69.

17. HMC furthermore provided the Plan trustees with a vast number of informational "Service Bulletins," which quoted applicable laws and provided general advice as to various transactions in which the Plan might engage, including the propriety of particular forms of investment. See, e.g., Third-Party Plaintiffs' Exhibits # 47, 48.

18. Based upon the continued assurances and apparent expertise of HMC and its employees, the Plan trustees relied upon them to see that their fiduciary responsibilities were carried out in compliance with ERISA regulations.

19. Despite Third-Party Defendants' contention that some of the informational and advisory material stated that "[i]t is not [the Hancel McCord Company's] intent

to furnish investment, tax or legal advice" (Third-Party Plaintiffs' Exhibits # 47–48), and despite the fact that Adell Houston's letter (Third-Party Plaintiffs' Exhibit # 42) regarding the propriety of the leasebacks provided that "[b]efore a trust enters into a lease it should have legal counsel," it is clear that Paul Self was never so advised when he consulted McCord or Houston in person. While Self and Third-Party Plaintiffs failed to retain an attorney for the Plan (other than Attorney Hunter's brief retention), McCord and Houston never refused to give Self or the trustees counsel and advice, nor did they ever tell them that they would not render the advice sought and that Self or the trustees should rather consult and/or retain an attorney or investment counsellor to see that the Plan's transactions were in conformity with ERISA. Instead, Houston and McCord actually provided investment, tax and legal advice.

20. In fact, after the Plan retained Attorney Edwin K. Hunter for advice on the legality of the leasebacks, the Hancel McCord Company advised that Attorney Hunter's opinion that the leasebacks were not in conformity with 29 U.S.C. §§ 1104, 1106 was an incorrect opinion. Attorney Hunter had been retained by Self after the Plan's accountant, Rueben Broussard, became concerned over the fact that eighty to ninety percent of the total Plan assets were invested in real estate. Broussard arranged to meet with Hunter and Paul Self on two occasions in late 1979 and recommended that the Plan divest itself of the store properties. Self therefore told Hunter to devise a scheme whereby the Plan would divest itself of those properties.

21. Paul Self subsequently telephoned Adell Houston and asked her about the legality of the leaseback of the store properties. Self furthermore told Houston about Attorney Hunter's advice to have the Plan divest itself of the store properties. While Houston denied that Self had ever told her about Attorney Hunter or about any divestiture plan, she acknowledged

that she had spoken to Self about the propriety of the Plan's investing trust monies in real estate. Houston testified, however, that she merely responded to Self by reading him the pertinent provision of the Trust document which states: "The Trustee may invest up to 100% of the Trust Fund in Qualifying Employer Real Property and/or Qualifying Employer Securities, as defined in Section 407(d) of ERISA." Third-Party Plaintiffs' Exhibit # 15, Art. VI, Sec. 6.1 at pp. 10–11. The Court does not accept Houston's version of the conversation, to-wit, that she read the provision to Self but *did not* tell him that his Plan's store property investments were proper. Rather, the Court accepts Paul Self's version that Houston advised him that the leaseback arrangements were proper and further told him that Attorney Hunter did not know what he was talking about.

22. While there was no in-court testimony whatsoever concerning the legal memorandum addressed to Hancel McCord from Dallas Attorneys Jack W. Hawkins and Suzan E. Riddle (Third-Party Plaintiffs' Exhibit # 83 [Deposition of Edwin Kidd Hunter, deposition exhibit # 6]), Attorney Hunter indicated in his deposition that this memorandum was provided to him by Rueben Broussard. This Court can only reasonably assume that the Hancel McCord Company provided this memorandum (which, again, is addressed to Hancel McCord) to either Self or Broussard in support of their position that the leaseback arrangements were proper according to ERISA requirements.

The memorandum, initially dated 10/31/74, and subsequently stamped "Aug 31 1979", was characterized by Attorney Hunter as being "generally ... the kind of opinion we usually render to the Trustee, because ... it relates to the nature of investments." As Hunter further acknowledged, "[if] the actual facts [of the Plan's store property investments] concerning the nature and type of investment ... followed the memorandum, then the ... plan was proper and not contrary to ERISA...."[2]

2. Hunter also testified in his deposition that the memorandum "makes some assumptions which

are perhaps in error, and those assumptions may mean that the application of this memoran-

Third-Party Plaintiffs' Exhibit # 83, p. 22. The Court thus concludes that the memorandum was furnished by the Hancel McCord Company to the Plan trustees or Broussard or Broussard's accounting firm in support of Houston's advice to Self that the store property investments fell within the requirements of ERISA.

23. As a result of Houston's advice and the information provided by HMC, Paul Self made no further inquiry as to the propriety of the Plan's investments and he told Attorney Hunter that the Plan would retain its store property investments and that no divestiture scheme from Hunter would be required.

24. In January, 1982, Darla Perry, an accountant employed by Broussard's firm, became concerned about the fact that (1) the fair market value of the real property held by the Plan was not listed on the Form 5500, but rather the properties were listed at cost, and (2) the Plan held more than ten percent of its assets in employer real estate. When she telephoned HMC, she first spoke with Adell Houston, who referred her to David Knight. She discussed the two areas with Knight, who advised her that he would research the questions and get back to her. Knight subsequently called her back and advised her that there was no need for concern in either area because of a specific provision in the Plan documents allowing for individual accounts.[3] See Third-Party Plaintiffs' Exhibit # 78.

25. Despite the assurances of Hancel McCord and Adell Houston that they and the Hancel McCord Company would make certain that all Plan documents complied with ERISA regulations, they failed to do so with regard to reporting the fair market value of the Plan's real estate investments. The financial statements were prepared by the Broussard accounting firm and, in accordance with the standardized procedure of the American Institute of Certified Public Accounts in existence until December, 1982, said statements carried the value of the Plan's real estate investments at cost. Not only should the Hancel McCord Company have recognized that the real estate was being carried at cost because of the fact that the same exact valuation appeared on their reports year after year, but Adell Houston noticed the footnote on the 1979 Financial Statement (Third-Party Plaintiffs' Exhibit # 19) which read: "Fixed assets are stated at cost." Houston admitted that she knew that ERISA required real property to be carried at fair market value at the time she noticed the footnote, but she advised neither the Plan's trustees nor the Plan's accountants that they must provide the fair market value information.[4] The Plan and its accountants therefore reported the value of the plan's real estate holdings at cost until 1983, when new standard accounting procedures were instituted by the American Institute of Certified Public Accountants which were employed by the Plan's accountants to carry the fixed assets at their fair market value.

26. Neither Paul Self nor any Plan trustee ever made any inquiry of McCord, Houston or the Hancel McCord Company regarding the amount of rent which should

---

dum, to the facts of the Gibson stores, is inappropriate ...." Third-Party Plaintiff Exhibit # 83, p. 21.

3. The Court notes with interest that the legal memorandum cited in Finding No. 22, *supra,* states:

"Act Section 407(a) prohibits, with certain exceptions, an employee benefit plan from acquiring or holding ... any employer real property which is not 'qualifying employer real property.' ... The exception to Act Section 407(a) which applies to the Gibson plans is found in Act Section 407(b)(1) which provides that the restrictions of Section 407(a) do not apply to any acquisition or holding or

qualifying employer real property by an 'eligible individual account plan.' "

4. There was some conflict in Houston's testimony such that she first testified that she never advised anybody about that requirement apart from the information contained in the service bulletins. She later testified that she talked to "Self or someone" and asked if they were to use the cost valuation provided, and whoever it was said "yes" and she then told them that the property had to be carried at fair market value. The Court views this conflict in testimony against Houston, and finds that she never acted properly to correct the erroneous reporting procedure which she recognized to exist.

be charged by the Plan to Self's companies, which leased the store properties owned by the Plan.

27. At the Board of Directors meetings for the Plan, Paul Self customarily would tell the Trustees what transactions he wanted the Plan to consummate and no Trustee would ever dissent, nor question any of Self's propositions. Paul Self acknowledged that he personally made all decisions as to Plan investments and the other Trustees would complacently acquiesce. Clearly, Trustees David Self, Amanda Self, Ollie Mae Sharp, Louise Shelton and Charles C. Peveto failed to pay heed to their responsibilities for and took no active part in managing the Plan.

## ANALYSIS AND CONCLUSIONS OF LAW

### I. *Jurisdiction and Venue*

A. Jurisdiction is vested in this Court as the action arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (1974). 29 U.S.C. §§ 1132(e)(1), (f); 28 U.S.C. § 1331.

B. Pendent jurisdiction is vested in this Court over the Third-Party Plaintiffs' state law claims for liability in tort, fraudulent misrepresentation, and breach of contract because the state and federal claims asserted all derive from a common nucleus of operative fact. *Owens Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 371, 98 S.Ct. 2396, 2401, 57 L.Ed.2d 274 (1978); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1965).

C. This Court has venue over the asserted claims because they arose in the Western District of Louisiana, Lake Charles Division, and because the Hancel McCord Company con-

ducts business in said District. 28 U.S.C. §§ 1391(b), (c).

### II. *Preemption of State Law Claims*

The Third-Party complaint asserts a cause of action against Third-Party Defendants arising under ERISA "to obtain full indemnification for breaches of the Third-Party Defendants' fiduciary duties," alleging that: "Third-Party Defendants violated th[eir] fiduciary obligations with respect to the Plan by undertaking to administer the Plan and its assets and to advise the Plan regarding the legality and prudence of its investments and failing to adequately fulfill their obligations with respect thereto." Second Amended Third-Party Complaint, ¶¶ 9–10. Moreover, Third-Party Plaintiffs assert causes of action arising under Louisiana state law, sounding in liability in tort (Louisiana Civil Code Articles 2315–16), fraudulent misrepresentation, and breach of contract. Third-Party Complaint, ¶¶ 11–15. Third-Party Defendants, however, contend that these state law claims are preempted by ERISA, 29 U.S.C. § 1144(a), as interpreted by the Supreme Court in *Shaw v. Delta Air Lines*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983).

Congress enacted ERISA as a comprehensive legislative remedial scheme to resolve problems in private employee benefit plans and to provide security stability and uniformity in this legal arena. 29 U.S.C. §§ 1001(a)–(b). In order to establish national uniformity, Congress legislated that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).[5] In *Shaw v. Delta Air Lines, supra*, the Supreme Court reasoned that Congress used the term "relate to" in its broadest sense, 103 S.Ct. at 2900, and that if a state law "has a connection with or reference to" an employee benefit plan, it is preempted.[6] This Court must there-

---

5. "State law" is defined as including "all laws, decisions, rules, regulations, or other State action having the effect of law." 29 U.S.C. § 1144(c)(1).

6. Congress used the words "relate to" in § 514(a) in their broad sense. To interpret § 514(a) to preempt only state laws specifically designed to affect employee benefit plans would be to ignore the remainder of § 514.... Nor, given the legislative history, can § 514(a) be interpreted to preempt only state laws dealing with the subject matters covered by ERISA—reporting, disclosure, fiduciary responsibility, and the like. The bill that became ERISA originally

fore determine whether the state law causes of action asserted by Third-Party Plaintiffs "relate to" the Plan so as to be preempted.

■ In the case at bar, it is clear that the state law claims for liability in tort, fraudulent misrepresentation, and breach of contract are preempted. The Third-Party·Complaint itself explicitly provides that it is brought "to obtain full indemnification for breaches of the Third-Party Defendants' fiduciary duties as provided in § 409 of ERISA, 29 U.S.C. § 1109; such duties having been defined in § 404 of ERISA, 29 U.S.C. § 1104." Third-Party Complaint, ¶ 9. The Third-Party Plaintiffs having stipulated to liability for breaches of their own fiduciary responsibilities,[7] it is apparent that they may be entitled to indemnification from Third-Party Defendants only with regard to those fiduciary duties which were undertaken by Third-Party Defendants in reference to the Plan. Because any fiduciary duties owed by Third-Party Defendants arise under ERISA, the liability of Third-Party Defendants for any intentional or negligent act or omission, fraudulent misrepresentation, or breach of contract relating to the Plan or its assets must be adjudged solely by reference to ERISA. Insofar as the asserted principles of state law may be relevant, they relate directly or indirectly to the duties of Third-Party Defendants in connection with the Plan and therefore the application of such principles is preempted. *Shaw, supra; Holland v. Burlington Industries, Inc.,* 772 F.2d 1140, 1147 (4th Cir.1985) (state law claim for severance benefits preempted); *Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320, 328 (2d Cir.1985) (state claims for severance benefits preempted); *Ellenburg v. Brockway, Inc.,* 763 F.2d 1091, 1095 (9th

Cir.1985) (state law claim for breach of implied covenant of good faith and fair dealing preempted); *Authier v. Ginsberg,* 757 F.2d 796, 800 (6th Cir.1985), *cert. denied* — U.S. ——, 106 S.Ct. 208, 88 L.Ed.2d 177 (1985) (common law action for wrongful discharge preempted); *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1356–57 (9th Cir.1984), *cert. denied* — U.S. ——, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985) (common law claims of breach of contract implied in fact, promissory estoppel, estoppel by conduct, fraud, and breach of contract preempted); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208 (8th Cir.1981), *cert. denied* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) (common law claim for tortious interference with contract preempted); *Phillips v. Amoco Oil Co.,* 614 F.Supp. 694, 708 (N.D.Ala.1985) (common law claims of fraudulent misrepresentation preempted); *District 65, UAW v. Harper & Row Publishers, Inc.,* 576 F.Supp. 1468, 1487 (S.D.N.Y. 1983) (common law claims of fraud, conversion, unjust enrichment, and tortious interference with contract preempted); *Ogden v. Michigan Bell Telephone Co.,* 571 F.Supp. 520, 524 (E.D.Mich.1983) (common law fraud claim preempted); *Whitaker v. Texaco, Inc.,* 566 F.Supp. 745 (N.D.Ga.1983) (state law misrepresentation and breach of fiduciary duty claims preempted); *see Children's Hospital v. Whitcomb,* 778 F.2d 239 (5th Cir. 1985) (Louisiana statute requiring that mental illness benefits, under employee benefit plan, equal physical illness benefits held preempted by ERISA); *cf. Dedeaux v. Pilot Life Ins. Co.,* 770 F.2d 1311 (5th Cir.1985) (employee's common law breach of contract and tort claims against insurance company which issued his employer's group policy held to be saved from preemption by 29 U.S.C. § 1144(b)(2)(A)).[8] As rec-

---

contained a limited pre-emption clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected these provisions in favor of the present language, and indicated that the section's pre-emptive scope was as broad as its language. *Shaw, supra,* 463 U.S. at 98, 103 S.Ct. at 2900–01.

**7.** See the Trial Stipulations Between Third-Party Plaintiffs and Third-Party Defendants, *supra.*

**8.** "The only relevant state laws, or portions thereof, that survive this preemption provision are those relating to plans that are themselves exempted from ERISA's scope." *Alessi v. Raybestos-Manhatten, Inc.,* 451 U.S. 504, 523 n. 20, 101 S.Ct. 1895, 1906 n. 20, 68 L.Ed.2d 402 (1981).

ognized by the Supreme Court:

> The pre-emption provision was intended to displace all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements. *Metropolitan Life Ins. Co. v. Massachusetts,* —— U.S. ——, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985).

The determination that Third-Party Plaintiffs' state law claims are preempted is furthermore supported by the legislative history of ERISA and is consistent with the Congressional intent to reserve to Federal authority the sole power to regulate the field of employee benefit plans, eliminating the threat of conflicting or inconsistent state and local regulation. *Shaw, supra,* 103 S.Ct. at 2901.[9] The Court therefore concludes that the state law claims asserted by Third-Party Plaintiffs are preempted, and the sole basis for indemnification must arise from the fiduciary obligations, as defined in ERISA, undertaken by Third-Party Defendants in reference to the Plan.

## III. *Fiduciary Status and Duties*

The establishment of standards of fiduciary responsibility in the pension plan context was a primary objective in the enactment of ERISA. *Donovan v. Cunningham,* 716 F.2d 1455, 1463 (5th Cir.1983), *cert. denied* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). Accordingly, ERISA includes a comprehensive scheme of both specific and general regulations regarding fiduciary conduct. *Id.*[10] Third-Party Defendants contend that they are not subject to these regulations, however, on the basis that they are not "fiduciaries" as that term is defined in ERISA, and that their duties were as purely ministerial "paper-shufflers." In accordance with the Findings of Fact set forth above, this Court rejects this contention and finds that the duties and actions undertaken by Third-Party Defendants clearly establish their role as fiduciaries with regard to particular transactions of the Plan.

The definition of "fiduciary" under ERISA is set forth at 29 U.S.C. § 1002 (21)(A), which provides in pertinent part:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or *exercises any authority* or control *respecting management or disposition of its assets,* (ii) he *renders* his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.

29 U.S.C. § 1104(a). In discharging these duties, a fiduciary must not engage in specified prohibited transactions. *Id.* § 1106.

---

**9.** Statements by the bill's sponsors during the subsequent debates stressed the breadth of federal pre-emption. Representative Dent, for example stated:

> "Finally, I wish to make note of what is to many the crowning achievement of this legislation, the reservation to Federal authority the sole power to regulate the field of employee benefit plans. With the preemption of the field we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation." 120 Cong.Rec. 29197 (1974).

Senator Williams echoed these sentiments:

> "It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law." *Id.* at 29933. *Cited in Shaw, id.* 103 S.Ct. at 2901.

**10.** (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge

*investment advice* for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, *or has any authority or responsibility to do so, or* (iii) he *has any discretionary authority or discretionary responsibility* in the administration of such plan. (Emphasis·added.)

Because Congress enacted ERISA as a comprehensive remedial statute, a liberal construction of this provision is warranted in order to effect ERISA's remedial purposes. *Eaton v. D'Amato,* 581 F.Supp. 743, 746 (D.D.C.1980); *Brink v. DaLesio,* 496 F.Supp. 1350, 1375 (D.Md.1980), *modified on appeal,* 667 F.2d 420 (4th Cir. 1981); *see also Chicago Board Options Exchange, Inc. v. Connecticut General Life Ins. Co.,* 713 F.2d 254, 260 (7th Cir. 1983); Little & Thrailkill, *Fiduciaries Under ERISA: A Narrow Path to Tread,* 30 Vand.L.Rev. 1, 4 (1977).

■ In accordance with the Findings of Fact set forth above, it is clear that Hancel McCord, Adell Houston, and the Hancel McCord Company exercised fiduciary functions with respect to the Plan. In the first place, they exercised discretionary authority regarding the management and disposition of Plan assets, and rendered investment advice [11] with regard to the store property leaseback arrangements. ·Findings of Fact, ¶¶ 8, 11, 13, 20, 21, 22, 24. Hancel McCord exercised discretionary authority respecting the disposition of Plan assets, and rendered investment advice when he told Paul Self that the Plan could not legally own the property at Toledo Bend Lake and that it must dispose of the same. Findings of Fact, ¶ 12.

Third-Party Defendants also had discretionary authority and discretionary responsibility in the administration of the Plan as evidenced by their admitted responsibility to amend the Plan to conform with ERISA requirements, and the fact that on several occasions they supplied Plan Amendments along with Board of. Directors' Meeting minutes for pro forma ratification by the Trustees. Findings of Fact, ¶¶ 7, 16. *See Chicago Board, supra* 713 F.2d at 759–60 (insurance company a fiduciary because of its power to amend). Their discretionary authority and responsibility is further illustrated by the Third-Party Plaintiffs heavy reliance upon them to answer any and all questions regarding the administration and management of the Plan. Findings of Fact, ¶¶ 7, 9. Third-Party Defendants assured the Third-Party Plaintiffs that they would handle everything to ensure compliance with ERISA and that they had retained a large attorney firm, and they consistently induced reliance by providing informational advice as to ERISA requirements and the propriety of particular transactions. Findings of Fact, ¶¶ 7, 9, 15, 17.

This Court's conclusion that Third-Party Defendants exercised discretionary authority respecting management of the Plan and its assets, rendered investment advice, and had discretionary authority and responsibilities in the administration of the Plan is buttressed both by judicial interpretation and the legislative history of 29 U.S.C. § 1002 (21)(A). As recognized in the Conference Report:

The term 'fiduciary' ... includes any person who renders investment advice for a fee and includes persons to whom 'discretionary' duties have been delegated by named fiduciaries. While the ordinary functions of consultants and advisers to employee benefit plans (other than investment advisers) may not be considered as fiduciary functions, it must be recognized that there will be situations

---

11. 29 U.S.C. § 1002(21)(A)(ii) provides that a person is a fiduciary to a plan to the extent that he renders investment for a fee or other compensation, direct or indirect, with respect to any property of such plan. While no direct evidence is before the Court as to any Third-Party Defendant receiving monies or charging a fee for investment advice, the Court finds that such advice was rendered as part of the "package deal" warranted to Third-Party Plaintiffs, which included any and all advice sought to keep the Plan in conformance with ERISA requirements. Third-Party Defendants were compensated for their services, and the fact that they rendered investment advice helped to ensure the continued reliance upon them by Third-Party Plaintiffs. Third-Party Defendants therefore were at least indirectly compensated for the investment advice which they rendered.

where such consultants and advisers may[,] because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority or control regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition. H.R.Conf.Rep. No. 93–1280, 1974 U.S. Code Cong. & Admin. News 5103.

Third-Party Defendants in the case at bar certainly held themselves out as having special expertise, which was used to exercise discretionary authority as set forth above. Moreover, the actions outlined in the Findings of Fact, *supra*, are clearly beyond the group of functions categorized as purely ministerial in 29 CFR § 2509.75–8, D–2.

Courts have broadly construed the term "fiduciary" in order to effect the well-recognized remedial purposes of ERISA. In *Eaton v. D'Amato, supra*, the court held that a consulting firm and its officers were fiduciaries to the employee benefit plans which they administered, and recognized that Congress fully expected the definition of fiduciary to be liberally construed. *Id.*, 581 F.Supp. at 746. That court observed:

> Applying a restrictive judicial gloss to the term "fiduciary" itself would, in effect, enable trustees to transfer important responsibilities to a largely immunized "administrative" entity. A clear congressional desire to expand the scope of fiduciary standards of conduct should not be so undermined. *Id.*

Likewise, observing that a defendant's advice was "relied heavily" upon by plan trustees concerning various plan transactions, the court in *Brink v. DaLesio, supra*, held that such consultants must be held to fiduciary standards. *Id.*, 496 F.Supp. at 1374–75. *See also Eaves v. Penn*, 587 F.2d 453 (10th Cir.1978) (a potential purchaser of company who recommended plan assets be used to finance indirectly his purchase held to fiduciary status); *Foltz v. U.S. News & World Report,*

*Inc.*, 608 F.Supp. 1332, 1344 (D.D.C.1985), *aff'd in part, vacated in part* 760 F.2d 1300 (D.C.Cir.1985) (dictum—a defendant may have been a fiduciary because it rendered appraisals which in turn were utilized by fiduciaries in administering the plans' assets).

This Court's determination is furthermore appropriate in light of ERISA's preemption of Third-Party Plaintiffs' state law claims. Recognizing the clear Congressional intent to provide a comprehensive scheme to "occupy the field" of protecting the interests of employee benefit plan participants,[12] indeed "[i]t would be anomalous if Congress eliminated the protections offered by state law without providing comparable federal protections." *Russell v. Massachusetts Mutual Life Ins. Co.*, 722 F.2d 482, 488 (9th Cir.1983), *rev'd on other grounds* —— U.S. ——, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Therefore the Third-Party Defendants are to be held liable as fiduciaries to the extent that they had authority or responsibility over Plan assets.

## IV. *Fiduciary Duties Breached*

As fiduciaries, Third-Party Defendants and Third-Party Plaintiffs are charged with having possessed the following responsibilities:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan;
> >
> > (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
> >
> > (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circum-

---

**12.** Note 9, *supra*.

stances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter. 29 U.S.C. § 1104(a)(1).

While Third-Party Plaintiffs stipulated to the entry of a consent decree with regard to the claims of plaintiff, William E. Brock, Secretary of the United States Department of Labor, nothing within the Consent Decree, the Notice of Agreement to Enter Consent Decree, or the Trial Stipulations Between Third-Party Plaintiffs and Third-Party Defendants establishes or stipulates to the exact basis of Third-Party Plaintiffs liability to Plaintiff; that is, there is no acknowledgement that any fiduciary duties owed to the Plan participants were breached by Third-Party Plaintiffs. As such, it becomes somewhat difficult to ascertain which fiduciary duties were breached for which Third-Party Plaintiffs are entitled to be indemnified by Third-Party Defendants? Although the Trial Stipulations fail to admit the breach of particular fiduciary duties, this Court finds that it was the clear intent of the parties to stipulate, *only* for purposes of the action between Third-Party Plaintiffs and Third-Party Defendants, that fiduciary duties were breached as follows: [13]

1. The failure to require payment of fair rent on leases executed in 1977 between the Plan and Sel-Mart of Sulphur, Louisiana, Inc., and Danor Wholesale, Inc. for the use of Orange, Texas and Sulphur, Louisiana store buildings that were owned by the Plan. The Third-Party Plaintiffs permitted the Plan to engage in a prohibited transaction by allowing it to lease the Orange and Sulphur store buildings to parties in interest. 29 U.S.C. § 1106. On the same basis, Third-Party Plaintiff Paul Self was guilty of managing the Plan properties in his own self interest. These leaseback transactions constituted breaches of fiduciary duty as defined by ERISA. 29 U.S.C. § 1104.

2. Third-Party Plaintiff Trustees failed to revalue the market value of the Orange and Sulphur store buildings each year as required by the Plan documents.

3. The Third-Party Plaintiff Trustees failed to adequately diversify the Plan's assets by investing the vast bulk of the Plan's money assets in the Orange and Sulphur store buildings.

This Court concludes that Third-Party Defendants had fiduciary responsibility with regard to each of these items. In regard to the prohibited lease transactions,

---

**13.** The Trial Stipulations Between Third-Party Plaintiffs and Third-Party Defendants acknowledge "three basic charges of wrongdoing" asserted by Plaintiff against Third-Party Plaintiffs. Moreover, the Trial Stipulations acknowledge that the Plaintiff's claims "have been compromised by the Plaintiff, and Defendant/Third-Party Plaintiff." The Trial Stipulations also include the following:

The Third-Party Defendants agree that the Third-Party Plaintiff's compromise with the [Plaintiff] was reasonable. The Third-Party Plaintiffs also agree to waive any defense that they might have, to the claim of Third-Party Plaintiffs, based upon a theory that Third-Party Plaintiffs had, in fact, no liability to the [Plaintiff]. For purposes of the action between the Third-Party Defendants only, Third-Party Defendants concede that Third-Party Plaintiffs were liable to the [Plaintiff] for the

amounts and in the manner agreed upon in the Notice of Agreement to Enter Consent Decree.

The Notice of Agreement fails to contain, however, any mention of the "three basic charges of wrongdoing" set forth in the Trial Stipulations, and nothing explicitly acknowledges that Third-Party Plaintiffs breached their fiduciary duties and engaged in prohibited transactions, even for purposes of this action only. Nevertheless, the fact that the "three basic charges of wrongdoing" were set forth in the Trial Stipulations and the fact that Third-Party Defendants conceded that Third-Party Plaintiffs were liable leads the Court to believe that the parties intended to stipulate that Third-Party Plaintiffs were liable to Defendant as a result of their commission of those acts asserted in Plaintiff's "three basic charges of wrongdoing."

Third-Party Defendants gave specific advice to Paul Self, and the Plan's accounting firm, concerning the framing of the leases, the time period for which the leases should be drawn, and the legal propriety of the leaseback arrangements. Findings of Fact, ¶¶ 8, 11, 13, 17, 20, 21, 22, 24. The Third-Party Defendants therefore are liable for the violation of 29 U.S.C. §§ 1106(a)(1)(A), (E), § 1106(a)(2), and § 1107(a), as they failed to discharge their duties with respect to the Plan with the care, skill, prudence and diligence under the facts of this case that a prudent person acting in a similar advisory and consultant capacity and familiar with both the legal requirements of ERISA and the real property holdings of the Plan would use in the conduct of an enterprise of a like character and with like aims. 29 U.S.C. § 1104 (B). Despite the fact that Third-Party Defendants were never consulted as to the amount of rent to be charged (Findings of Fact ¶ 26), it is clear that Third-Party Plaintiffs would not have engaged in the prohibited leasing transactions in the first place if Third-Party Defendants had prudently fulfilled the fiduciary duties undertaken by them respecting the Plan.

Contrary to their assurances that the Plan would "be handled accurately and qualified to meet the standards of government requirements,"[14] Third-Party Defendants failed to revalue the market value of the Orange, Texas and Sulphur, Louisiana store buildings each year as required by the Plan documents, thereby violating 29 U.S.C. § 1104 (a)(1)(D). See Findings of Fact ¶¶ 15, 25. Adell Houston failed to see that this requirement was met in spite of her awareness that it was being violated. Findings of Fact # 25. Moreover, Third-Party Defendants failed to advise Third-Party Plaintiffs to adequately diversify the Plan's assets, thereby contributing to the violation of 29 U.S.C. § 1107 (a)(2). See Findings of Fact, ¶¶ 15, 20–24.

■ The Court furthermore concludes that Hancel McCord and Adell Houston are personally liable for their acts and omissions which constitute breaches of their fiduciary responsibilities. While the Hancel McCord Company, as an entity, is properly held to be a fiduciary, it cannot shield its officers and employees from liability for their fiduciary breaches under the express terms of ERISA, which provides that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries ... *shall be personally liable* to make good to such plan any losses to the plan resulting from each such breach ...." 29 U.S.C. § 1109(a) (emphasis added); *Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 641 (W.D.Wisc. 1979). Because all three of the Third-Party Defendants acted as fiduciaries with respect to the bases of Third-Party Plaintiffs liability to the Plan, they are therefore liable *in solido*.

## V. *Co-Fiduciary Liability*

■ Although the Court finds that Third-Party Defendants breached their fiduciary duties in respect to the Plan, Third-Party Plaintiffs nevertheless cannot be relieved of liability for the acts and omissions of those to whom fiduciary duties were delegated. If the Plan instrument itself provided for a procedure whereby a named fiduciary may designate persons who are not named fiduciaries to carry out fiduciary responsibilities, the named fiduciaries might not be held liable for the acts or omissions of the Third-Party Defendants.[15] 29 C.F.R. § 2509.75–8, FR–14 (1985). Because the Plan in the case at bar does not provide for any such procedure, however, then any designation of Third-Party Defendants as fiduciaries by Third-Party Plaintiffs will not relieve Third-Party Plaintiffs from responsibility or liability for the acts and omissions of Third-Party Defendants. 29 C.F.R. § 2509.75–8, FR–14, FR–15 (1985); *see Chicago Board, supra*, 713 F.2d at 259. Thus, even though Third-Par-

---

**14.** See, e.g., Third-Party Plaintiffs' Exhibit # 55.

**15.** This is true except as provided in 29 U.S.C. § 1105(a), relating to the general rules of co-fiduciary liability, and 29 U.S.C. § 1105(c)(2)(A) relating in relevant part to the designation of persons to carry out fiduciary responsibilities.

ty Plaintiffs may have reasonably relied on Third-Party Defendants to see that ERISA regulations were complied with, they cannot escape their own fiduciary obligations under ERISA.

■ Moreover, Third-Party Plaintiffs are also liable pursuant to 29 U.S.C. § 1105(a)(2), which provides in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan ... if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; ....

Certainly, Paul Self and the other Trustee Third-Party Plaintiffs enabled the Third-Party Defendants to breach their fiduciary responsibilities. Third-Party Plaintiffs failed to exercise the care, skill, prudence and diligence demanded by 29 U.S.C. § 1104(a) by failing to retain their own legal counsel as was sometimes recommended by Third-Party Defendants (Findings of Fact ¶ 19), and by failing to heed the advice of the one attorney whom they did retain for a short while and who recommended that the Plan divest itself of the store properties. Findings of Fact, ¶¶ 20–23. As Trustees, David Self, Amanda Self, Ollie Mae Sharp, Louise Shelton, and Charles C. Peveto failed to take any action whatsoever in managing the Plan and complacently acquiesced in the recommendations of Paul Self and Third-Party Defendants, thereby failing to exercise the care and diligence required of them as Plan fiduciaries. Findings of Fact, ¶ 27. Moreover, the utter and purblind reliance of Paul Self and the other Third-Party Plaintiffs upon Third-Party Defendants was surely imprudent, and Third-Party Plaintiffs must be held responsible for their omissions to act responsibly as fiduciaries. The failure of Third-Party Plaintiffs to exercise their fiduciary obligations plainly enabled Third-Party Defendants, as unnamed

fiduciaries, to commit breaches of their fiduciary duties, and Third-Party Plaintiffs therefore cannot be absolved from liability. *See Freund, supra*, 485 F.Supp. at 642–43. Indeed, the Court finds that these breaches of Third-Party Plaintiffs' fiduciary duties played a major part in causing the losses sustained by the Plan.

## VI. *Damages*

The Third-Party Defendants are therefore held liable to reimburse the Third-Party Plaintiffs for forty percent (40%) of all amounts paid in settlement of the lease transaction claims as is set forth in paragraph 1 of the Notice of Agreement to Enter Consent Decree, with interest thereon to accrue at the rate of eight percent (8%) per annum from the date on which Third-Party Plaintiffs provide payment as stipulated with Plaintiff.

Third-Party Defendants are furthermore held liable to reimburse Third-Party Plaintiffs for forty percent (40%) of those amounts which Third-Party Plaintiffs are compelled to pay pursuant to the terms of paragraph numbers 3, 4, 5, and 6 of the Notice of Agreement to Enter Consent Decree pertaining to an adjustment in the 1978–1984 fair market sales values and to a recalculation of all past and present Plan participants' accounts to reflect the stipulated increases in the valuations of the Plan's Orange, Texas and Sulphur, Louisiana properties. Interest is to accrue thereon at a rate of eight percent (8%) per annum from the date on which Third-Party Plaintiffs make payment as stipulated with Plaintiff.

■ The award of attorney's fees and costs in this action is a matter lying within the sound discretion of this Court. 29 U.S.C. § 1132(g)(1). Because of the nondelegable fiduciary responsibilities owed by Third-Party Plaintiffs to the Plan, and in light of said Third-Party Plaintiffs imprudent acts and omissions regarding the claims asserted in this action, the Court finds that an award of attorney's fees and costs is not sufficiently justified and will not be granted.

## CONCLUSION AND ORDER

Wherefore, the Court now ORDERS that the parties enter good faith negotiations to arrive at a specified sum to be awarded Third-Party Plaintiffs in accordance with the Court's Opinion herein and that proposed judgments be submitted to the Court by all parties within 30 days from the date of the entry of this Opinion, along with a certificate attesting to each item of damage included in each party's calculation of the total amount of judgment proposed to be entered.