RAPIDES REGIONAL MEDICAL CEN-
TER; Hospital Management Services,
Inc.; Rapides Health Services, Inc.; and
Rapides Regional Medical Center Em-
ployees' Pension Plan

v.

AMERICAN UNITED LIFE
INSURANCE COMPANY.

Civil Action No. 94–0815.

United States District Court,
W.D. Louisiana,
Alexandria Division.

Aug. 5, 1996.

Charles S. Weems, III, Raymond L. Brown, Jr., Gregory Brian Upton, Dorrell J. Brister, J. Kendall Rathburn, Gold Weems Bruser Sues & Rundell, Alexandria, LA, for Hospital Management Services Inc., Rapides Health Services Inc., Rapides Regional Medical Center Employees Pension Plan.

Charles S. Weems, III, Gregory Brian Upton, Dorrell J. Brister, J. Kendall Rathburn, Gold Weems Bruser Sues & Rundell, Alexandria, LA, for Rapides Foundation.

Jeffrey A. Riggs, Provosty Sadler & Delaunay, Alexandria, LA, Phillip R. Scaletta, Ice Miller Donadio & Ryan, Indianapolis, IN, for American United Life Insurance Co.

Jeffrey A. Riggs, John P. Doggett, Provosty Sadler & Delaunay, Alexandria, LA, for Gardner & White Corp., Jeffrey A. Wylie.

## RULING

LITTLE, District Judge.

Before the court is a motion for partial summary judgment filed by plaintiffs, The Rapides Foundation, Hospital Management Services, Inc., Rapides Health Services, Inc., and Rapides Regional Medical Center Employee Pension Plan (hereafter referred to collectively as "Rapides"). Plaintiffs' action primarily alleges that defendant American United Life Insurance Company ("AUL") breached fiduciary duties owed to Rapides under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, with respect to funds it administers for the plaintiffs under a group annuity contract. The instant motion for partial summary judgment seeks a ruling on the threshold issues in this litigation—whether AUL is a fiduciary under ERISA with respect to the funds it administers for Rapides under the contract *or* with respect to the contract itself. AUL defends against the motion by arguing primarily that the "guaranteed benefit policy" exclusion of 29 U.S.C. § 1101(b)(2)(B) shields its actions regarding Rapides' funds from ERISA fiduciary status. This motion presents legal questions of first impression in this circuit.

## FACTUAL BACKGROUND

The following facts are uncontested by Rapides and AUL. On 1 May 1971, the Louisiana Hospital Association entered into Group Annuity Contract No. G45,188 ("the GAC") with AUL. In October of 1978, Rapides General Hospital, the forerunner to the Rapides Regional Medical Center, the largest regional acute care hospital in central Louisi-

ana, adopted the Rapides Regional Employee Pension Plan ("the Plan") in order to provide retirement benefits for its employees. At the same time, Rapides also became a party to the GAC by executing its formal acceptance of that contract. As the retirement plan is funded primarily through the group annuity contract with AUL, the Plan and the GAC thus operate in tandem to provide retirement benefits for Rapides' employee participants.

The operation of the Plan and this particular contract is typical in many ways of other employer sponsored retirement plans funded through group annuity contracts, also known as "deposit administration contracts," commonly offered by the insurance industry.[1] Rapides' Plan, in particular, is a "defined contribution" plan; that is, designated contributions, called "stipulated payments" under the GAC, are made by the employer, usually at a fixed percentage of participants' wages (here seven percent), to the Plan. These funds are then invested and administered by the insurer.

Under the group annuity contract, which is subject to our review, AUL established individual accounts for each participant to record the amount of stipulated payments deposited by Rapides on the participant's behalf. As is common throughout the industry, however, the actual funds invested under the contract are commingled with funds in AUL's general account, and AUL is allowed to use its investment expertise to seek a maximum return on the funds. During this initial, or accumulation, phase of the contract, AUL would, in theory, regularly credit each individual account with interest reflecting its general account investment experience. In the second, or annuity, phase of the contract, when a participant actually retires, AUL is required to use the funds in that individual's account to purchase an annuity for the retiree guaranteeing him a fixed stream of income for the rest of his life. Under this type of group annuity or deposit administration contract, then, the two crucial factors affect-

ing the amount of benefits a participant would receive at his retirement are the amount of return credited to his account during the accumulation phase of the contract and the price at which the accumulated funds in his account are converted into an annuity upon his retirement.

At the heart of the dispute regarding Rapides' attempt to characterize AUL as an ERISA fiduciary in this case is the presence of certain guarantees in the GAC. Citing the "guaranteed benefit policy" safe harbor provision of 29 U.S.C. § 1101(b)(2)(B), AUL contends that these guarantees affecting, *inter alia*, interest rate earnings and annuity purchase rates exempt it from ERISA fiduciary duties. Rapides, on the other hand, claims that these guarantees are either largely illusory or so insignificant that this court must impose fiduciary responsibilities on AUL. We will discuss the precise nature of these guarantees and their effect on AUL's alleged fiduciary status in greater detail after we offer a brief review of the statutory and jurisprudential guidelines that inform our ruling.

## LAW AND ANALYSIS

### A. Summary Judgment Standard

■ Summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure if the court determines that there is no genuine issue of material fact for trial and that the moving party is entitled to a judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 255, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Maher v. Strachan Shipping Co.*, 68 F.3d 951, 954 (5th Cir.1995). To defeat a properly asserted motion, the non-movant must "do more than simply show that there is some metaphysical doubt as to material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). In the language of Rule 56(e), the non-movant must

---

1. See D. McGill and D. Grubb, *Fundamentals of Private Pensions,* 551–564, 493–95 (6th ed. 1989), for a discussion of group deposit administration annuity contracts and a later variant, the intermediate participation guarantee group annuity contract. See also generally Scott V. Rozmus, Comment, *Insurer's Beware: General Account Activities May Subject Insurance Companies to ERISA's Fiduciary Obligations,* 88 Nw.U.L.Rev. 803 (1994).

"set forth specific facts showing that there is a genuine issue for trial." While a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party, such a dispute is only "material" when the governing law indicates that it may affect the outcome of the suit. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## B. The Guaranteed Benefit Policy Exclusion: From *Peoria Union* to *Harris Trust*

We now turn to the subject matter at hand. As both parties acknowledge, a person is a "fiduciary"[2] under ERISA with respect to an employee benefit plan "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or *exercises any authority or control respecting management or disposition of its assets....*" 29 U.S.C. § 1002(21)(A) (emphasis added). Because the statutory term "person" includes a mutual insurance company like AUL, *see* 29 U.S.C. § 1002(9), AUL would appear to be a fiduciary under ERISA if it exercises authority or control over "assets" of Rapides' retirement plan. The statutory term "assets," however, remains undefined in ERISA except for a few specific exclusions. Of particular importance to this case is the exclusion provided for a "guaranteed benefit policy" under 29 U.S.C. § 1101(b)(2), which states in relevant part:

In the case of a plan to which a guaranteed benefit policy is issued by an issuer, the assets of such plan shall be deemed to include such policy, but shall not, solely by

reason of the issuance of such policy, be deemed to include any assets of such insurer.

The section goes on to define a "guaranteed benefit policy" as:

... an insurance policy or contract to the extent that such policy or contract provides for benefits *the amount of which is guaranteed by the insurer.*

29 U.S.C. § 1101(b)(2)(B) (emphasis added). As one court has reasonably suggested, Congress created this exclusion because it "did not want to make an insurance company that sells *a standard annuity contract*—one that provides 'benefits the amount of which is guaranteed by the insurer'—a fiduciary toward the purchase of the contract." *Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance Co.,* 698 F.2d 320, 327 (7th Cir. 1983) (emphasis added). The crucial question in this case, then, is whether the group annuity contract executed by Rapides and AUL is a "standard annuity contract" of the type that Congress envisioned to be exempt from fiduciary responsibility or whether it is another type of investment instrument, the benefits from which are indefinite.

The first important judicial decision to define the parameters of the guaranteed benefit policy exclusion as it applied to group annuity contracts similar to the one at issue arose in the seminal *Peoria Union* decision authored by Judge Posner. *Id.* In that case, the Seventh Circuit analyzed a "group deposit administration annuity contract," *id.* at 321, a contract similar in many, though not all, respects to the GAC,[3] and decomposed the operation of the contract into an "accumulation phase" and "annuity phase." *Id.* at

---

**2.** An ERISA "fiduciary" is charged with the responsibility of "discharg[ing]" his duties with respect to a plan solely in the interest of the participants and their beneficiaries and—
 (A) for the exclusive purpose of:
  (i) providing benefits to participants and their beneficiaries; and
  (ii) defraying reasonable expenses of administering the plan....
29 U.S.C. § 1104.

**3.** The principal difference between the *Peoria Union* contract and the one *sub judice* is that the former operated in conjunction with a defined benefit retirement plan rather than a defined contribution plan. In other words, "the employ-

er must make annual contributions at a level that, combined with the income from investing the contributions, is reasonably calculated to cover the entire cost of the annuities that the plan must purchase for its beneficiaries as they retire. If there is not enough money in the plan when the time comes to buy an annuity for a retiring employee, the employer must make an additional contribution since his obligations to the employees covered by the plan are unconditional." *Id.* at 321. For both securities laws and ERISA purposes, however, the court found that it did not matter that the employer rather than the annuitant bore the investment risk, as long as the insurer was spared such risk. *Id.* at 325–327.

325 (relying on *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967)). Drawing on the methodology of several Supreme Court decisions that addressed whether insurers issuing group annuity contracts could be considered exempt from federal securities laws,[4] the court found that while the plan sponsor was assured of a fixed payout at the annuity phase of the contract, during the accumulation phase of the contract the sponsor "turned over the assets of the pension plan to [the insurer] to manage with full investment discretion, subject only to a modest income guaranty." *Id.* at 327. Stated another way, the fact that the employer rather than the insurer retained the primary investment risk during the accumulation phase of the contract rendered the insurer an ERISA fiduciary with regard to the plan assets, at least during the accumulation phase. *Id.*[5]

Some eight years later, the Third Circuit analyzed a similar group annuity contract (there denominated a "Deposit Authorization contract") and reached a contrary conclusion. *See Mack Boring and Parts v. Meeker Shar-*key *Moffitt, Actuarial Consultants of N.J.*, 930 F.2d 267 (3rd Cir.1991). In that case, the court noted the presence of several guarantees in the contract,[6] and, more importantly, rejected *Peoria Union*'s analysis of the accumulation phase of this kind of contract. *Id.* at 271–73. In particular, the Court rejected the notion that significant variability in return during the accumulation phase of the contract could disqualify it from "guaranteed benefit policy" status, and instead held, in light of the statutory language, that "it is enough that the DA contract 'provided' guaranteed benefits to plan participants at some finite point in the future [i.e., at the annuity phase]." *Id.* at 273.

Finally in 1993, the Supreme Court granted certiorari in *John Hancock Mutual Life Ins. Co. v. Harris Trust & Savings Bank*, 510 U.S. 86, 89–91, 114 S.Ct. 517, 521, 126 L.Ed.2d 524 (1993), in order to resolve this split in authority.[7] In *Harris Trust*, the court chose "to follow the Seventh Circuit's lead," 510 U.S. at 101–03, 114 S.Ct. at 527, in *Peoria Union* and specifically held that the "free funds"[8] component of a deposit admin-

---

4. *See SEC v. Variable Annuity Life Ins. Co. of America*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), *and United Benefit* 387 U.S. 202, 87 S.Ct. 1557.

5. In *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561 (7th Cir.1991), *cert. denied*, 502 U.S. 1099, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992), the Seventh Circuit applied the methodology of *Peoria Union* but distinguished the earlier holding. In particular, the court found that the "flexible annuity" contract at issue fell within the guaranteed benefit policy exclusion primarily because the insurer declared fixed annual rates of interest in advance and provided the purchaser with real renewal or rollover rights, namely the opportunity to (1) withdraw all funds and invest them elsewhere if dissatisfied with the declared rates, (2) leave funds with the insurer and add nothing more, or (3) make additional purchases. *Id.* at 566–68. Interestingly, though, the court did finally imply that the insurer was a fiduciary to some extent because of its unlimited authority to amend the terms of the annuity contract. *See id.* at 569 (citing *Chicago Board Options Exchange v. Connecticut General Life Ins. Co.*, 713 F.2d 254, 259–60 (7th Cir.1983)).

6. These included a guarantee of a minimum rate of interest and principle to be credited to the contract holder's account, guarantees of annuity purchase rates, and obligations to pay certain amounts upon contract termination. *Id.* at 269.

7. In the lower court decision, the Second Circuit had sided with the Seventh Circuit's approach in *Peoria Union* and held that "[t]o the extent the insurer engages in the discretionary management of assets attributable to that phase of the contract which provides no guarantee of benefit payments or fixed rates of return, ... the insurer should be subject to fiduciary responsibility." *Harris Trust and Savings Bank v. John Hancock Mutual Life Ins. Co.*, 970 F.2d 1138, 1144 (2nd Cir.1992).

8. The deposit administration account in *Harris Trust* was similar to the contract *sub judice* in that it involved an accumulation phase in which funds deposited by the employer would be commingled in John Hancock's general account and a pro-rata share of the investment gains and losses attributable to the general account assets would be allocated to the employer's account. Rather than create separate accounts for individual employees, as the GAC does in the present case, however, the *Harris Trust* contract created two accounts for bookkeeping purposes. The first account, the "Pension Administration Fund," recorded assets and attendant interest gains and losses. When assets were converted into retirement benefits upon request of the plan administrator, the transaction was then recorded by adding an amount set by Hancock to the second account, the "Liabilities of the Fund."

istration contract issued to fund a retirement plan was not a guaranteed benefit policy. *Id.* at 105–07, 114 S.Ct. at 529. Therefore, the court concluded, those "free funds" managed by the insurer were "plan assets" and the insurer's conduct regarding them must be judged by ERISA fiduciary standards. *Id.* Just as in *Peoria Union*, the Supreme Court's determination that the guaranteed benefit policy exclusion did not apply to the funds in question hinged on its finding that the contract at issue did not allocate "investment risk" for those funds to the insurer. *Id.* If the contract had allocated investment risk to the insurer, then the insurer would have benefitted from the exclusion. *Id.*

■ In reaching its holding, the court set forth what all parties now agree is the governing standard for determining whether a group annuity contract, or elements of it, can be characterized as falling within the "markedly confined" parameters of the guaranteed benefit policy exclusion of section 1101(b)(2)(B). *Id.* at 95–97, 114 S.Ct. at 524. In the court's own words:

> … to determine whether a contract qualifies as a guaranteed benefit policy, each component of the contract bears examination. A component fits within the guaranteed benefit policy exclusion *only if it allocates investment risk to the insurer.* Such an allocation is present when the insurer provides a *genuine guarantee of an aggregate amount of benefits payable to retirement plan participants* and their beneficiaries.

*Id.* at 105–07, 114 S.Ct. at 529 (emphasis added). In order to resolve whether a contract's "free funds," that is, funds deposited with an insurer during the accumulation phase of a deposit administration contract and that have not been definitively "converted into guaranteed benefits," *id.*, can be exempted from "plan asset" status under the guaranteed benefit policy exclusion, the court further stated:

> these indicators are key: the insurer's guarantee of a reasonable rate of return on those funds and the provision of a mechanism to convert the funds into guaranteed benefits at rates set by the contract.

*Id.* While not constituting a rigid two part test, this last statement points toward two important means by which a court may measure whether investment risk has been shifted from the employer and its employees to the insurer during a particular phase of a contract. In light of these "indicators," our analysis must still keep its ultimate focus on the touchstone of whether the contract component under consideration provides a "genuine guarantee of an aggregate amount of benefits." *Id.* Finally, we must also remain mindful of the Court's own recognition that "Congress has specifically instructed, by the words of limitation it used, that we *closely contain* the guaranteed benefit policy exclusion." *Id.* at 97, 114 S.Ct. at 525 (emphasis added).

C. Are AUL's Actions Regarding the Funds Invested Under the GAC Exempt from ERISA Fiduciary Status Under the Guaranteed Benefit Policy Exclusion?

Rapides argues in this motion that AUL should be subject to ERISA fiduciary duties on two separate grounds: first, with respect to the funds Rapides has invested with AUL under the GAC, and second, with respect to the GAC itself. We address the first ground

The contract further required John Hancock to maintain the Pension Administration Fund in an amount equal to at least 105 percent of the Liabilities of the Fund. If the amount in the Pension Administration Fund ever fell below the Minimum Operating Level (105 percent of the Liabilities of the Fund), the accumulation phase of the contract would automatically terminate, Hancock would be obligated to purchase annuities to cover all benefits previously guaranteed by Hancock, and the contract would revert to a simple deferred annuity contract. *Id.* at 91–93, 114 S.Ct. at 522. This modification of the standard deposit administration contract has been classified as an "Intermediate Participation Guarantee Group Annuity Contract." *See* McGill and Grubb, at 562–64.

The "free funds" component of the contract thus refers to "the excess in the Pension Administration Fund over the Minimum Operating Level (105 percent of the amount needed to provide guaranteed benefits)." *Harris Trust*, 510 U.S. at 91–93, 114 S.Ct. at 522. As such, the "free funds" component essentially represented that portion of the plan's funds (plus a small cushion) that had not been specifically converted into guaranteed benefits and could be used to pay "non-guaranteed benefits" to retirees. *Id.*

asserted by Rapides in this section of our ruling.

Rapides' argument that AUL owes fiduciary duties under ERISA with respect to the funds invested under the GAC relies on the basic premise of *Harris Trust* that the guaranteed benefit policy exclusion is only available to an insurer like AUL exercising discretionary authority over plan assets if the contract component under consideration allocates investment risk to the insurer. Rapides contends that such an allocation of investment risk is not present during the accumulation phase of the GAC specifically because (1) the GAC fails to guarantee a rate of return to the plan participants and (2) there is no mechanism to convert funds into guaranteed benefits at rates set by the contract. AUL, however, counters that the presence of several guarantees in the GAC qualify the contract for the guaranteed benefit policy exclusion. As we suggested earlier, the precise scope and meaning of these guarantees is therefore central to the resolution of this debate.

### 1. The Interest Rate Guarantee

The first guarantee that AUL identifies as establishing its non-fiduciary status is found in Art. I, Sec. 1 of the Contract and essentially provides that Rapides' employee participants' accounts will be credited with a minimum interest rate of three and three quarter percent per annum. AUL clings tenaciously to this guarantee as evidence that it has assumed significant investment risk in light of the possibility that its general account investments might prove to have a negative or negligible annual return. Although Judge Posner noted that a similar "modest income guaranty" (a declining rate of 7½ percent to 3½ percent over the first three years of the contract) was insufficient to qualify as a significant assumption of investment risk in *Peoria Union*, 698 F.2d at 327, the interest

rate guarantee *sub judice* is actually even less meaningful in light of the general amendment powers granted to AUL under the GAC. In particular, Art. V, Sec. 6 of the GAC authorizes AUL to:

> change this Contract ... as to (i) any and all of the tables, (ii) *the rate of any interest allowed and the basis for its computation* and all other conditions entering into the determination of the amount of any payment to be made by [AUL]. . . .

Thus, under the contract AUL actually possessed and still possesses the power to lower or even eliminate altogether its proffered guarantee of a minimum interest rate.[9]

AUL, however, draws the court's attention to a clause that appears later in the same section of the contract:

> ... but such changed tables, rates and conditions shall not apply to Stipulated Payments made prior to the effective date of the change.

AUL contends that, in spite of its general power to amend the contract, this language means that any change in interest rates can only be credited to future stipulated payments and not to prior payments—that is, funds previously deposited with AUL under the GAC. AUL seems to claim that the quoted section supplies Rapides with a guarantee that interest rates on funds on hand could not be retroactively altered. Were this interpretation of the contract consistent with AUL's actual practice, it might represent at least some kind of meaningful guarantee of a reasonable rate of return. *See Associates in Adolescent Psychiatry*, 941 F.2d at 567 (distinguishing *Peoria Union* on basis of fixed annual rates of interest that transformed Flexible Annuity into "nothing so much as a series of fixed annuities, one year in duration, with the purchaser having the option to renew").[10]

---

**9.** AUL informs us that it has historically credited interest at rates in excess of the three and three quarter percent return allegedly guaranteed in Article I of the contract. That information will not misdirect our mission, however. We ask not what was done with the funds on deposit but what was guaranteed to the depositor. *See Peoria Union*, 698 F.2d at 322–27 (although interest actually being credited was at annual rates in

excess of "modest income guarantee" established for the first three years of contract, court still found that contract alleviated insurer from investment risk).

**10.** Whether *Associates in Adolescent Psychiatry* is still good law is unclear in light of *Harris Trust*'s more explicit and controlling interpretation of

A closer look at AUL's actual performance history under the GAC, however, reveals that AUL never in fact adhered to or intended to abide by this proffered interpretation of Art. V, Sec. 6. Indeed, both depositions of AUL officials and AUL records reveal that AUL consistently altered the rate of interest it credited to funds under its administration. First, AUL officials openly admitted that AUL's policy and practice was to declare periodically the interest rate to be credited to Rapides' accounts and then to apply that rate both to "old interest rate pockets" and new funds yet to be deposited. Second, and more importantly, AUL's "Current Interest Rate History" provided in response to Rapides' Interrogatory No. 6(e) confirms that this was indeed AUL's practice. This account history clearly reveals that AUL consistently and frequently altered the interest rates it credited on funds already on deposit in apparent derogation of Art. V, Sec. 6. Currently, AUL is crediting interest on funds on deposit at rates considerably lower than the interest rates originally or previously credited on these same funds. In short, all that Art V, Sec. 6 apparently means to AUL is that it has the right to declare new interest rates on *any* funds, those already on deposit or those yet to be deposited, for specified periods of time.

Thus, when pressed, AUL officials refer to this voluntary policy as the real bedrock of their interest rate guarantee. When asked in depositions to supply the contractual basis for such a guarantee, the officials can only point to internal AUL documents and marketing memoranda. As further evidence of the fleeting and insecure nature of this alleged guarantee, we note that, although AUL officials repeatedly claim that these declared interest rates would be valid for at least a year from the date they are declared, AUL's own records again reveal that AUL changed the rates more than once a year on several occasions, specifically in 1986 and 1987. Although AUL has voluntarily adhered to this one year interest rate guarantee in recent years, nothing in the contract constrains it to continue this policy.

Finally, AUL cites Amendment No. 5, a 1991 amendment of the GAC, as evidence of the stability and weightiness of its interest rate guarantee. This amendment defines "current rate of interest" as "each of the annual effective rates of interest as determined and declared by AUL from time to time and credited on a monthly basis to each interest pocket maintained within the Individual Accounts" and specifies that these rates shall always be equal to or greater than the three and three quarters percent interest rate guarantee contained in Art. 1 of the original contract. A close examination of the amendment and the actual interest rate record reveals only that AUL has now voluntarily codified its recent practice of making annual declarations of the interest rates to be credited on old deposits. Nothing in the contract, however, prohibits AUL from voiding this amendment or altering it to allow interest rate declarations to be made more frequently or to be valid for a shorter period. In short, the interest rate guarantee stressed by AUL as an important factor distinguishing the GAC from the deposit authorization contract in *Harris Trust* proves to be so full of loopholes as to be almost meaningless.

█ Of importance, we note the only related guarantee that binds AUL is its promise that 100% of all payments received on a participant's behalf would be credited to a participant's account and accumulated for purposes of providing the participant's retirement benefit. We find that this guarantee of mere principal is insufficient to be characterized as a guarantee of a reasonable rate of return under *Harris Trust*.

### 2. The Conversion Mechanism

The second guarantee that AUL refers us to as establishing its right to avail itself of the guaranteed benefit policy exclusion as interpreted by *Harris Trust* is found in Article IV, Sec. 2. This contract provision states that in converting funds accumulated in an individual participant's account into an annuity, AUL will use annuity purchase rates set forth in two conversion tables appended to the contract. Although AUL may modify such tables under Art. IV, Sec. 2, this con-

the guaranteed benefit policy exclusion and its

endorsement of *Peoria Union*'s methodology.

tract provision also states that AUL will use any then-in-effect tables for conversion provided that such tables are not less favorable than those originally appended to the contract.[11] While this minimum annuity purchase table guarantee would appear to constitute the kind of conversion mechanism contemplated in *Harris Trust*, once again AUL's broad amendment powers and its actual performance under the contract undermine any such claim.

First, it appears that this minimum annuity purchase rate guarantee is, just as the alleged interest rate guarantee, subject to AUL's broad amendment powers under Art. V, Sec. 6. Although Art. V, Sec. 6's clause proscribing AUL from altering interest rates retroactively with respect to funds already on deposit ostensibly applies to "tables" as well, there is no evidence that AUL has adhered to this proscription with any more regularity than it adhered to the clause's supposed limitation on interest rate changes. Perhaps more importantly, though, Art. V, Sec. 6 also provides that AUL reserves the right to change the contract as to "all other conditions entering into the determination of the amount of any payment to be made by [AUL]." As AUL's actual performance under the contract demonstrates, this extremely broad and undefined unilateral power in relation to the final benefit calculas clearly undercuts any annuity purchase rate guarantees.

Of particular importance is the direct and unrefuted evidence supplied by Rapides that before AUL actually applied whatever annuity purchase rates were then in effect to the accumulated funds in a participant's account, it subtracted various commission, override and backend load charges. Although AUL asserts in conclusory fashion that such charges were always incorporated into the annuity purchase tables themselves and thus could not affect the minimum annuity purchase rates described in Art. IV, Sec. 2 of the GAC, Rapides has offered evidence demonstrating that the exact opposite is true.

In one example, a participant's (Mary V. Cleveland) "gross withdrawal amount" of $30,018.31 (i.e., that individual's accumulated "account value") was reduced *prior* to conversion by $2,164,87 for a purported "backend load," "commission" and "override." Only *after* this 7.21% deduction was made did AUL apply its annuity premium tables. Though this particular example was explicitly brought to the court's attention in plaintiffs' memorandum in support of its motion for partial summary judgment, AUL has made no attempt to explain, refute or qualify the evidence. Thus, the court must assume that this example typifies AUL's annuity purchase practice and thus reveals how it has interpreted its undefined power to alter the contract as to "all other conditions entering into the determination of the amount of any payment to be made by [AUL]" under Art. V, Sec. 6 of the GAC. In sum, despite AUL's protestations to the contrary, there is no real guaranteed conversion mechanism in the GAC as contemplated by *Harris Trust*.

### 3. AUL Is an ERISA Fiduciary With Respect to the Funds Invested in the GAC

■ Having examined the writings that AUL has proffered as evidence that the GAC was a guaranteed benefit policy and having found those submissions to be insignificant, if not entirely illusory, we conclude that the GAC did not allocate any appreciable investment risk to AUL. Moreover, keeping our gaze fixed on the touchstone of the *Harris Trust* analysis, we find absolutely no evidence that during the accumulation phase of the contract the GAC provided a "genuine guarantee of an aggregate amount of benefits payable to retirement plan participants." *Harris Trust*, 510 U.S. at 106, 114 S.Ct. at 529. Accordingly, we hold that AUL's actions regarding the monies invested in the GAC during the accumulation phase of the contract cannot be shielded by the guaranteed benefit policy exclusion. AUL is therefore an ERISA fiduciary with respect to its stewardship of these funds.

---

11. To be precise, Art. V. Sec. 2 provides in relevant part:

   ... any such modification will not be less favorable than Table 1 and 2 and will be uniformly applicable to all contracts of this class on the date such Participants Accumulation Value is applied.

**D. The GAC as a "Plan Asset" and AUL's Fiduciary Duty with Respect to the GAC Itself**

As we alluded earlier, Rapides has declared that AUL is not only an ERISA fiduciary with respect to the funds invested in the GAC but also with respect to the GAC itself. In making this second assertion, Rapides relies on the narrow language of the guarantee benefit policy exclusion[12] and, more importantly, on several cases that have clearly recognized that a group annuity contract may itself be considered a "plan asset" and that, therefore, an insurer's ability to amend the contract, and thus alter its value, must be subject to ERISA fiduciary standards. *Chicago Board of Options Exchange, Inc., v. Connecticut General Life Insurance Company,* 713 F.2d 254, 259–60 (7th Cir. 1983); *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.,* 805 F.2d 732, 737–38 (7th Cir.1986), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); *see also Associates in Adolescent Psychiatry,* 941 F.2d at 569 (following *Chicago Board*) *and Ferry v. Mutual Life Ins. Co. of New York,* 868 F.Supp. 764 770 (W.D.Pa.1994) (plaintiffs stated a claim under ERISA because several guaranteed investment contracts were deemed "plan assets" and plaintiffs alleged that defendant exercised control over aspects of the contracts). AUL understandably fails to respond to this argument because, as is clear from our preceding analysis, AUL unmistakably possesses authority under the GAC to amend the contract and thus alter its value.

■ As the court recognized in *Chicago Board,* however, any fiduciary status imposed on the insurer with respect to a group annuity contract itself must be narrowly circumscribed and indeed may "only govern[ ] actions taken in regard to amending the contract and does not impose fiduciary obligations upon [the insurer] when taking other actions." *Chicago Board,* 713 F.2d at 259. Accordingly, we find that AUL is also an ERISA fiduciary with respect to any actions taken to amend the GAC.

### CONCLUSION

■ This case has presented questions of first impression in this circuit regarding an insurance company's fiduciary duties under ERISA, or its exemption from same, with respect to a group annuity contract. Having applied the analysis directed by *Harris Trust,* this court holds that AUL is a fiduciary under ERISA with respect to the funds Rapides has surrenderd to AUL under the GAC. In addition, utilizing the logic of *Chicago Board,* this court holds that AUL is also an ERISA fiduciary with respect to any actions taken to amend the GAC. Accordingly, plaintiffs' motion for partial summary judgment is GRANTED in these particular respects. Today we have determined that American United Life Insurance Company is a fiduciary vis-a-vis Rapides Regional Medical Center et al. AUL's compliance or noncompliance with fiduciary duty standards is not the subject of this ruling.

---

**12.** Rapides is correct in noting that the guaranteed benefit policy exclusion itself provides that "in the case of a plan to which a guaranteed benefit policy is issued by the insurer, *the assets of such plan shall be deemed to include such policy.*" 29 U.S.C. § 1101(b)(2)(B) (emphasis added).